In re Billie Vester **RASBURY**, Debtor.

In re **BILL'S FORESTRY SERVICE, INC.**, Debtor.

**Bankruptcy Nos. 90–70871, 90–71457.**

United States Bankruptcy Court, N.D. Alabama, W.D.

Sept. 5, 1991.

Richard O'Neal, Asst. U.S. Atty., Birmingham, Ala., Scott Crosby, Neal I. Fowler, U.S. Dept. of Justice, Washington, D.C., for I.R.S.

Bruce Ely, Tuscaloosa, Ala., Marvin Franklin, Birmingham, Ala., Helen H. Ellis, Estate Analyst, Tuscaloosa, Ala., for debtors.

## MEMORANDUM OF DECISION

GEORGE S. WRIGHT, Chief Judge.

This matter came before the court on debtors' (Billie Vester Rasbury and Bill's Forestry Service, Inc.) objection to the claim of the United States Internal Revenue Service for retroactive withholding taxes (income, FICA and FUTA), interest and penalty for tax years 1986, 1987 and 1988. The court has heard evidence at hearing and reviewed the record of the case in the context of the applicable law. The debtors' objection to claim is due to be SUSTAINED, and the Internal Revenue Service's claims for the withholding taxes, interest penalty are due to be DISALLOWED.

### FINDINGS OF FACT

Billie Vester Rasbury of Winfield, president and shareholder of Bill's Forestry Service, Inc., testified that he went to work in the logging business with his father at age nine in 1940. Rasbury, a plaintiff in this objection-to-claim action against the Internal Revenue Service, told the court he had a tenth-grade education, and earned his high school equivalency certificate by taking the general educational development test in Tuscaloosa in 1962.

Rasbury testified that he had been in the logging contracting business for himself since 1976. His sole proprietorship was

incorporated as Bill's Forestry Service, Inc., in Fayette County, Alabama, in 1986. Rasbury became president of the new corporation. He and his wife, Jo Ann Rasbury, were sole shareholders. The Rasburys still occupy those roles.

Rasbury and Bill's Forestry Service, Inc., continued to contract with forest products companies like Weyerhaeuser Corp. to supply logs, to remove timber from the land of others and to pay crews who cut, skidded, bunched and hauled the logs. Generally, both sides to this controversy agree that Rasbury provided heavy equipment such as skidders, hydroaxe, knuckleboom loader and some of the trucks and fuel used to haul the cut timber. The men brought some of the trucks used for hauling, saws, other hand tools, safety equipment and their skills.

Three long-time Bill's Forestry crew members testified for the debtor that they were paid as independent subcontractors, which they indicated was consistent with widespread custom in the logging industry in West Alabama in the 1980s.

Thomas F. Collins of Fayette, Alabama, a certified public accountant who handled the Rasbury and the Bill's Forestry Service, Inc., accounts for the years at issue—1986, 1987 and 1988—testified that he advised Rasbury of the potential for problems with the Internal Revenue Service because of the classification. However, Mr. Collins testified that he also advised Mr. Rasbury that crew members qualified as independent contractors under the "twenty (20) factors", (a reference to the IRS and court interpretations of the "usual common law rules" referred to in 26 U.S.C. § 3121(d)(2)).[1]

Rasbury's employee witnesses generally testified that they were paid by the ton of wood produced, that they had no "employment" benefits such as health insurance or pension rights other than Workman's Compensation Insurance, that crew members hired and fired their own coworkers and decided when to work. The IRS states in its "Statement of Facts" in a trial memorandum filed April 29, 1991 at 3, paragraph 8: "Their (Rasbury's) workers engaged in cutting, skidding, loading and hauling) income was *based solely on the amount of timber which they were able to haul to the lumber and pulpwood companies.*"

On the other hand, the government produced three former truck drivers for Bill's Forestry, Inc. One testified on cross-examination that he had been involved in a physical fight with Rasbury after he quit the job, that he had been convicted of breaking and entering, a felony; and that he had neither paid taxes nor filed a return with the Internal Revenue Service for 1988, 1989 or 1990. This witness testified on direct examination that he had worked with Rasbury about seven months. He said that the signature on the independent contractor contract under his name was not his.

Another former truck driver with a Rasbury crew testified he worked with the debtor firm in 1987–88. The third said that the IRS audited him in 1988 for the 1987 tax year and that he ended up paying more taxes. He said he had worked with Rasbury's operation for only six months.

All three government witnesses indicated that they were paid by the day rather than by tonnage. The debtor introduced evidence that all three had signed Forms 4669 attesting that they had paid their own taxes on funds paid to them as independent contractors.

Additionally, expert witnesses testified for Rasbury that paying such logging crew members as independent contractors was widespread industry practice in West Alabama in the 1980s. They included Collins, C.P.A. for Rasbury/Bill's Forestry, two other logging contractors and 15–20 cutters, skidders and logging truck drivers; C. Stephen Richardson, C.P.A. for three logging contractors presently, who had represented seven to eight in the past, Steve Richardson and Co. of Tuscaloosa, Ala-

---

1. 26 U.S.C. § 3121(d)(2) provides:

 For purposes of this chapter, the term employee means—

 (2) any individual who, under the *usual common law rules* applicable in determining the employer-employee relationship, has the status of an employee; ... (emphasis added)

bama; G. Levert Lawrence, C.P.A. for five logging contractors presently who had represented 10 in the past, Morrison & Smith, C.P.A.s, Tuscaloosa, Alabama and Terry W. Jacobs, a registered forester, Mid-South Forestry Service, Inc., Gordo, Alabama. All testified they based their opinion on first-hand knowledge of the practices of their logging contractor and logging subcontractor clients in West Alabama.

The testimony taken as a whole presented a picture of dirty and dangerous work, requiring a high degree of skill. The aggregate of that testimony also showed that such skills are learned on the job, beginning at an early age and over a long period of time, by workers with little formal education or familiarity with detailed paperwork.

The government introduced as an expert witness, Ken Rolston of Panama City Beach, Florida, a former executive with the American Pulpwood Association, based in Washington, D.C., and former forester and wood procurement specialist with Kimberly–Clark Corp. at Childersburg, Alabama. The Kimberly–Clark mill is located approximately 100 miles from Tuscaloosa and would not be considered in the "West Alabama" area. Mr. Rolston described the pulpwood association as a trade/lobbying organization which represented more large paper mills and pulpwood purchasers than logging contractors. He testified that it was his opinion that those of Mr. Rasbury's crew members who brought "nothing but bare hands" to the job were employees rather than independent contractors.

However, even Rolston testified of one government witness who brought his own truck to the job "that sounds like an independent contractor" and of crew members who brought tools, supplied their own gasoline and hired their coworkers "it is gray" as to whether they were independent contractors or not.

Rasbury testified and government exhibits showed that Rasbury and Bill's Forestry Service, Inc., carried workmen's compensation insurance on crew members for the three years in question. Rasbury said the insurance was a requirement to do business with large firms like Weyerhaeuser. Rasbury's brief said: "Mr. Rasbury was advised by his insurance agent that this was common practice and did so only because he was required to do so by several of his major customers due, apparently, to their fear that the Alabama Department of Industrial Relations might find *them* to be the employers of Bill's Forestry Service's workers." *See* Debtor's Reply Memorandum Brief at 7. The logging contractor also said he deducted the cost of the men's coverage from the per-ton rate paid them as independent contractors, similar to a self-insurance program.

Rasbury and his witnesses testified that he filed IRS informational Forms 1099 on his men as independent contractors for most of the funds paid them by Bill's Forestry Service, Inc. Smaller sums were paid to the men and listed on Forms W2. Rasbury testified the totals paid on the W2s were for hours at minimum wage paid for equipment maintenance on "rain days". Rasbury contended the pay structure for maintenance was different because it was not production work of cutting, skidding, bunching, loading and hauling logs. He said he preferred to base work on tonnage because the incentive increased production.

In arguments and in its pretrial memorandum, the Internal Revenue Service disputed this description, alleging that use of W2 payments was merely a ruse to lower insurance premiums for workmen's compensation. Rasbury's brief noted at 7 that the amount reported on the W2s was also the amount reported to the insurance agent for workmen's compensation insurance. "Mr. Rasbury was advised that worker's compensation insurance was only required for employees and was advised by his insurance agent that the practice that the Service (IRS) seeks to impugn was common within the industry and accepted."

Both sides agree generally that workers signed written contracts indicating that they understood that they were independent contractors and that Rasbury would not withhold income, FICA or FUTA taxes from the amounts they earned under the contract. Evidence was inconclusive on

whether Forms 1099 were filed for the tax years prior to 1986. The record does not show whether or not Rasbury filed Forms 1099 for the years prior to 1986, the first tax year for which the government seeks additional tax. Mr. Rasbury testified that he instructed his then-accountant, Joe White, a public accountant, though not a certified public accountant, to file the 1099s, once he learned such were required (beginning in 1979). Mr. White, testifying as a government witness, said he never received the information necessary to fill out the Forms 1099. However, IRS did not present evidence showing that it had verified through its own records that the forms were NOT filed.

Both sides agree that the debtors filed IRS Forms 1096 and 1099 with IRS and their workers for the years at issue.

In January of 1989, Connie Brown, certified public accountant and revenue agent for the Internal Revenue Service, testified that Bill's Forestry Service, Inc. was picked at random for a "TCMP" (Taxpayer Compliance Measurement Program) audit for the 1987 tax year. This started the sequence of events that resulted in the tax action before the Bankruptcy Court.

Ms. Brown testified that as part of the "package audit" requirement, related returns are requested "to see if there is a potential payroll tax issue." She said she noticed that in some cases, Forms 1099 and W2s had been issued to the same persons and that the W2s were filled out in multiples of $134.00. (The debtor testified and stated in his brief that the men listed on W–2s were being paid minimum wage for "rain day" preventive maintenance. Forty hours at the then-minimum wage of $3.35–an–hour would be $134.00.)

After reviewing records in the Rasbury case, Ms. Brown apparently applied the twenty (20) factors [2] commonly used to differentiate between an independent contractor relationship and an employee relationship. In essence, the IRS concluded that the workers should have been classified as employees and that Bill's Forestry Service should have been withholding federal income tax and FICA and FUTA employment taxes, she said.

However, Collins said that he and Rasbury were told that if they were able to

**2.** In general, the twenty factors are used to evaluate the degree of independence and control a worker exercises in doing his or her work. Supposedly, the more control he/she has, the more likely that the IRS will classify the worker as an independent contractor as opposed to an employee—and vice-versa. As identified in the attachments to the government's trial memorandum brief, filed April 29, 1991, the twenty factors used by IRS in classifying workers as either independent contractors or employees include the following:

"1. *Instructions.* A worker who is required to comply with other persons instructions about when, where, and how he or she is to work is ordinarily an employee....; 2. *Training.* (Requiring training implies an employee status) ... 3. *Integration.* Integration of the worker's services into the business operations generally shows that the worker is subject to control.... 4. *Services Rendered Personally.* If the services must be rendered personally, presumably the person or persons for whom the services are performed are interested in the methods used to accomplish the work as well as the results.... 5. *Hiring, Supervising and Paying Assistants.* (implies control) ... 6. *Continuing Relationship.* ... 7. *Set Hours of Work* .... 8. *Full Time Required....* 9. *Doing Work on Employer's Premises* .... 10. *Order or Sequence (of tasks) Set* .... 11. *Oral or Written Reports* .... 12. *Payment by Hour, Week, Month* .... 13. *Payment of Business and/or Traveling Expenses* .... 14. *Furnishing of Tools and Materials....* 15. *Significant Investment....* 16. *Realization of Profit or Loss.* (If worker can realize profit or loss, the IRS would tend to consider him/her an independent contractor) ... 17. *Working for More Than One Firm at a Time.* If a worker performs more than de minimis services for a multiple of unrelated persons or firms at the same time, that factor generally indicates that the worker is an independent contractor ... 18. *Making Service Available to the General Public.* The fact that a worker makes his or her services available to the general public on a regular and consistent basis indicates an independent contractor relationship.... 19. *Right to Discharge.* The right to discharge a worker is a factor indicating that the worker is an employee and the person possessing the right is an employer.... 20. *Right to Terminate.* If the worker has the right to end his or her relationship with the person for whom the services are performed at any time he or she wishes without incurring liability, that factor indicates an employer-employee relationship ..."

contact all the workers who had been paid as independent contractors and get them to sign IRS forms 4669 attesting that the workers had paid their own tax on the compensation reported on the Forms 1099, the taxes actually paid by the workers would be deducted from any liability assessed against Bill's Forestry and Rasbury.

Collins testified that he and Rasbury were able to locate and get signatures on forms 4669 from ninety-four (94) percent of the men. They were unable to find the other six percent. Ms. Brown told the court that deduction of taxes actually paid by the workers who received the income would "abate" liability assessed against Rasbury. Collins recalled a March 14, 1989 meeting with Ms. Brown and IRS Group Manager William V. Poss in a letter to Debtor's tax counsel (Government Exhibit 26, Debtor's Exhibit 2):

> On March 14, 1989, we had a closing meeting regarding "income tax examination changes" for Bill's Forestry Service, Inc., with Internal Revenue Service Officers Connie Brown and Group Manager William V. Poss. They discussed the suggested changes which were minimal and therefore resulted in no tax due. In this meeting we were told that they (I.R.S.) disagreed with the 1099's that we had filed on independent contractors. They (William Poss & Connie Brown) gave us a book of Forms 4669 to be filled out and signed by the independent contractor stating they had filed their individual income tax returns and had included the 1099 amount received from Bill's Forestry Service, Inc. in that tax return. We were told that if we could get these forms 4669 filled out and signed, I.R.S. would accept them and give us credit for all that were brought in to them. Some weeks later when we had them filled out, Mrs. Connie Brown said I know you are not going to agree, so just take them to the appeals offices and they will give you credit. (Ms. Brown's worksheets admitted as Government's Exhibit 1, reflect a meeting with Rasbury and Collins March 24, 1989).

On April 14, 1989, Ms. Brown testified she prepared an "unagreed report" alleg-

ing that Rasbury owed some $161,502.69 in taxes, interest and penalty (Government's Exhibit 2). Negotiations between the debtor and the Internal Revenue Service continued into the summer of 1989. Negotiations broke down when Rasbury was unable to persuade other logging contractors to come forward with affidavits for the IRS admitting that they also paid their crews as independent contractors, Rasbury's counsel said in opening statement and in Debtors Reply Memorandum Brief filed April 30, 1991 at 12. "... But, due to the Debtors' and their accountant's inability to obtain affidavits from other logging contractors (to the effect that they also treated their workers as independent contractors), this case could not be settled administratively," Debtors' Reply Memorandum Brief said at 12.

(On motion from the government, further reference to the settlement negotiations between Rasbury and the Internal Revenue Service was held inadmissible. Consequently, the record is blank on that section of the dispute. Ms. Brown's supervisor, William V. Poss, was not called as a witness by either side.)

On June 22, 1989, the Internal Revenue Service issued a letter "proposing adjustments" of $161,502.69 to Rasbury and Bill's Forestry's tax obligation for the 1986, 1987 and 1988 (Government Exhibit 2). The unagreed report prepared by Ms. Brown was attached and hers is the only actual signature on this document. The letter itself, addressed "Dear Sir or Madam," is not signed. If the recipient does not agree with the "adjustment," it directs: "IF YOU DO NOT AGREE and wish a conference with the Regional Office of Appeals, you MUST LET US KNOW within 30 days."

Following this form letter, the record of this Bankruptcy Court case is blank until the government filed its first proofs of claim including the $161,502.69 on July 20, 1990 and August 31, 1990 in the individual and corporate bankruptcy cases. (Subsequently, the government filed an adjusted

proof of claim April 30, 1991 for a total $211,776.02 in taxes, interest and penalty.)

Rasbury and Collins testified that Rasbury and Bill's Forestry Service began treating crew members as employees effective October 1, 1989. Collins said the reclassification was a response to the IRS audit process.

The record is also blank during this time frame for the government's only IRS staff witness. Ms. Brown testified that she had no dealing with the Rasbury/Bill's Forestry case between April of 1989 and January of 1991 when IRS attorneys contacted her about the objection-to-claim litigation.

In this gap in the record between the summer of 1989 and the debtors' filing of the bankruptcy petitions (Rasbury's individual Chapter 11 was filed April 4, 1990; his business Chapter 11, July 5, 1990), the IRS failed to formally assess the tax liability it had claimed. It did not perfect a tax lien on the debtors' property.

Further, in answer to questions from the court, Ms. Brown testified that she knew of no attempt by the IRS to follow up on the Forms 4669 she had asked Rasbury to complete. Of the documentation needed to determine if the taxes had actually been paid, she said: "It is my understanding they (the forms) could be ordered and they may or may not get here." She said she did not know if the documents had been ordered. "I would think it would be whether we could get them or whether they even exist . . ."

Thus the total claimed by the IRS is apparently computed for the maximum taxes which *might* still be due on the compensation—as if none of the workers had paid any tax themselves.

Likewise, when asked a question on how the 26 U.S.C. § 6656[3] penalty sought by the government was computed, Ms. Brown said: "I can give an explanation, but I do not know if it would be correct."

At the conclusion of Ms. Brown's testimony, the court asked the witness if the IRS had computed the taxes actually paid by the ninety-four (94) percent of crew members who had signed the forms 4669 to determine how much, if any, taxes were actually due.

"That abatement is not made until the tax is assessed. There can be no abatement until assessment and there is no assessment because of bankruptcy," was Ms. Brown's testimony in answer to the question. She did not explain why the IRS did not compute the actual unpaid taxes for informational or evidentiary purposes.

She offered no testimony or does the record reflect any reason for the government's failure to assess when approximate-

---

**3.** 26 U.S.C. § 6656(a) now provides the following for deposits required after December 31, 1989:

**(a) Underpayment of deposits.**
In the case of any failure by any person to deposit (as required by this title or by regulations of the Secretary under this title) on the date prescribed therefor any amount of tax imposed by this title in such government depositary as is authorized under section 6302(c) to receive such deposit, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be imposed upon such person a penalty equal to the applicable percentage of the amount of the underpayment.
**(b) Definitions.**
For purposes of subsection (a)—
**(1) Applicable percentage.—**
(A) In general. Except as provided in subparagraph (B), the term, "applicable percentage" means—
(i) 2 percent if the failure is for not more than 5 days,

(ii) 5 percent if the failure is for more than 5 days but not more than 15 days, and
(iii) 10 percent if the failure is for more than 15 days.
However, the prior version of Section 6656 would apply to the withholding claimed in the Rasbury case. It reads:
In case of failure of any person required by this title or by regulation of the Secretary under this title to deposit on the date prescribed therefor any amount of tax imposed by this title in such government depositary as is authorized under section 6302(c) to receive such deposit, unless it is shown that such failure is due to reasonable cause and not due to wilful neglect, there shall be imposed upon such person a penalty of 10 percent of the amount of the underpayment. For purposes of this subsection, the term 'underpayment' means the excess of the amount of the tax required to be so deposited over the amount, if any, thereof deposited on or before the date prescribed therefor.

ly ten (10) months elapsed between the government's letter proposing adjustments and the filing of the first bankruptcy petition.

On July 20, 1990 and August 31, 1990, the Internal Revenue Service filed the proofs of claim against Billie Vester Rasbury and Bill's Forestry including the $161,502.69 in withholding taxes, interest and penalty claimed for 1986, 1987 and 1988.

On October 5, 1990, the debtors, Billie Vester Rasbury and Bill's Forestry Service, Inc., filed their objection to the IRS' claim. The court heard two days of testimony on the facts of this case, heard arguments and received briefs on the legal issues. The court took the issue under advisement for a decision on May 14, 1991. At that point, the debtor had not yet filed a reorganization plan since a decision on the 1986, 1987 and 1988 liability to the IRS will determine the parameters of the plan and indeed if a successful plan is possible.

## CONCLUSIONS OF LAW

—Considerations that support subjectability to the income tax are not necessarily the same as the considerations that support withholding. To require the employee to carry the risk of his own tax liability is not the same as to require the employer to carry the risk of the tax liability of its employee. *Required withholding, therefore, is rightly much narrower than subjectability to income taxation.* (emphasis added)

Justice Blackmun, writing for the majority, in *Central Illinois Public Service Co. v. United States,* 435 U.S. 21, 29, 98 S.Ct. 917, 921–22, 55 L.Ed.2d 82 (1978).

Both sides to this controversy—debtors' counsel and the Internal Revenue Service—have presented evidence designed to put this case in the larger context of a nationwide, decades-long dispute between the IRS and the forestry products industry over how workers should be classified for withholding tax purposes. The controversy, typically, includes a dispute both over how workers should be classified under the twenty (20) "common law" factors, and

whether the Section 530 "safe harbor" should be applied where IRS finds a misclassification.

This reclassification posture has been one of the most controversial tax enforcement issues facing the IRS. A November 9, 1990 report of the House Committee on Government Operations, "Tax Administration Problems Involving Independent Contractors," (adopted by the U.S. House of Representatives January 2, 1991) traced the history as follows:

In the mid–1970s, IRS had an active employment tax program resulting in large assessments against employers who misclassified workers as independent contractors. Congress reacted to this aggressive IRS reclassification effort by enacting Section 530 of the Revenue Act of 1978, which served to curb IRS activity in the classification area. The reason for the congressional action in 1978 appears to have been a belief that IRS was overzealous in its pursuit of potentially misclassified workers and employers guilty of misclassification.

IRS complains that Section 530, which was extended indefinitely by the Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982, restricts the extent to which it can examine and reclassify workers. IRS points to the "safe harbor" provisions of Section 530 as the cause. The safe harbor provisions eliminate an employer's liability for employment taxes arising from an employment relationship if the employer has a "reasonable basis" for treating the worker as an independent contractor, filed the necessary information returns, and has not treated any substantially similar worker as an employee. Reasonable basis includes three safe harbor provisions, which are: (1) a judicial precedent, such as an IRS letter ruling; (2) a past IRS audit, including audits not made for employment tax purposes, in which there was no assessment for employment taxes for substantially similar workers; and (3) a longstanding industry practice of classification ...

If a company cannot claim protection under one of the safe harbor provisions, then IRS is free to scrutinize the employer's classification decision against 20 "common law" factors, first adopted in the Social Security Act of 1935, and currently contained in the Internal Revenue Service Manual. The 20 factors revolve around the degree or right of control an employer has over workers, such as their hours, space and training. GAO, however, notes that "in determining the proper classification, these factors can be subjective."

An important question, which will be addressed later in the report, is what IRS should do when an employer, because of the subjective and somewhat confusing nature of the 20 factors, honestly misclassifies a worker, or a group of workers, as independent contractors. IRS' action on these types of cases, which is sometimes inconsistent, will be discussed later in the report.

H.R.Rep. No. 979, 101st Cong., 2d Sess. (1990) 1990 WL 201643, *7, 8, 9.[4]

A perspective on the *general* controversy is helpful. But the central issue here is the equities of the situation of this *particular* individual debtor, this *particular* corporate debtor for the *particular* years in question in West Alabama.

As the report cited above reveals, Section 530 was adopted as a stopgap. However, Congress has not yet enacted permanent legislation clarifying the rights of parties to these disputes. Consequently, the court must rely on existing law, stopgap or not, to decide this case. As also noted by the House committee, IRS reclassifications have resulted "in the destruction of viable businesses and the personal ruin of many individuals." 1990 WL 201643, *11.

The Bankruptcy Court may determine tax liability under the authority granted it by 11 U.S.C. § 505.[5] That section of the Bankruptcy Code grants the court broad powers to determine the amount or legality of any tax (including federal withholding taxes), any fine or penalty relating to a tax, or any addition to a tax, whether of the debtor or the estate.

As a result of the audit in 1989, a relatively new IRS agent made a determination reclassifying crew members from independent contractors to employees, resulting in a combined tax for the 1986–88 tax years of $210,576.02 (as evidenced by Claim No. 7) and set out as follows:

BILL'S FORESTRY SERVICE, INC—1986–88

| TAXABLE PERIOD | KIND OF TAX | AMOUNT OF TAX | PENALTY | SUB TOTAL | INTEREST TO PETITION DATE | GRAND TOTAL |
|---|---|---|---|---|---|---|
| 1986 | 940 | $4,231.90 | $423.19 | $4,655.09 | $1,837.71 | $6,492.80 |
| 1986 | 941 | $27,973.02 | $583.11 | $28,556.13 | $13,070.87 | $41,627.00 |
| 1987 | 940 | $6,450.84 | $645.08 | $7,095.92 | $1,969.25 | $9,065.17 |
| 1987 | 941 | $49,037.34 | $1,022.20 | $50,059.54 | $17,233.67 | $67,293.21 |
| 1988 | 940 | $7,301.85 | $730.19 | $8,032.04 | $1,278.94 | $9,310.98 |
| 1988 | 941 | $61,779.13 | $1,324.84 | $63,103.97 | $13,682.89 | $76,786.86 |
| TOTALS: | | $156,774.08 | $4,728.61 | $161,502.69 | $49,073.33 | $210,576.02 |

---

**4.** This opinion will use the *(computer screen) designation to pinpoint screen number for electronic citations to specific, direct quotations from certain documents.

**5.** 11 U.S.C. § 505(a) provides the following:
(a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

(2) The court may not so determine—
(A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title; or
(B) any right of the estate to a tax refund, before the earlier of—
(i) 120 days after the trustee properly requests such refund from the governmental unit from which such refund is claimed; or
(ii) a determination by such governmental unit of such request.

The taxes IRS seeks to collect of this debtor, as an individual, and/or from his failing business, are what would be classified as "trust fund" taxes, which are always given a priority and are never subject to a discharge in bankruptcy. *See* 11 U.S.C. § 507(a)(7)(C) and 523(a)(1)(A).[6] In other words, if retroactive liability were found and the business were unable to pay the taxes as priority during the Chapter 11, the tax obligation and the nondischargeable interest on it would continue accruing against Rasbury as an individual. It would follow Rasbury out of this bankruptcy until paid in full.

In the Rasbury/Bill's Forestry case, a finding of significant liability for these tax years, at the very least would tip the odds against the business completing a successful Chapter 11 reorganization. It would certainly take priority over the claims of other creditors who had provided the struggling debtor with goods and services. If the liability were large enough, it could doom the reorganization of this bankrupt business, and affect the debtor's ability to continue paying his men, all of whom he reclassified as employees October 1, 1989.

Sound policy goals can justify this kind of draconian retroactive liability. First and foremost is the deficit-ridden United States government's right to collect all taxes *which are due it.* Additionally, Social Security benefits for workers need to be paid for—whether through withholding by employers or by the self-employed as individuals.

As Justice Brennan said in a separate opinion joined by the Chief Justice and Justice Powell in *Central Illinois:*

> The only conclusion that can be drawn from Congress' consistent practice of avoiding retroactive imposition of withholding tax liability and its recent judgment that *"equity and custom"* require relief from inadvertent retroactive liability, I submit, is that additional withholding taxes should not, at least without good reason, be assessed against employers who did not know of and who had no reason to know of increased withholding obligations at the time wages had to be withheld. (emphasis added)

*Central Illinois* 435 U.S. at 37, 98 S.Ct. at 925–26.

The Rasbury case is just one relatively usual Chapter 11 in a low-income area of a low-income state in a recession year. The facts have been recited in some detail to illustrate what is at stake in this decision. Decreeing retroactive liability is a step that should not be taken lightly or without *all the relevant facts.*

THIS DISCUSSION WILL BE DIVIDED INTO THE FOLLOWING AREAS: I. ALLOCATION OF BURDENS OF PROOF; II. PROVING LIABILITY ON THE PROOF OF CLAIM (CLASSIFICATION OF THE RASBURY WORKERS AS INDEPENDENT CONTRACTORS OR EMPLOYEES UNDER THE "TWENTY (20) COMMON LAW" FACTORS); III. PROVING AMOUNT ON THE PROOF OF CLAIM (APPLICATION OF ABATEMENTS AND PENALTY) AND IV. WHETHER THE SECTION 530 SAFE HARBOR SHOULD APPLY.

## I.

THE INTERNAL REVENUE SERVICE HAS THE ULTIMATE BURDEN OF PROVING THE DEBTOR IS LIABLE FOR THE AMOUNT SOUGHT IN ITS PROOF OF CLAIM

■ Burden of proof must be considered in several contexts in this case. First, it

---

**6.** 11 U.S.C. § 507(a)(7)(C) provides the following:
> (a) The following expenses and claims have priority in the following order:
> (7) Seventh, allowed unsecured claims of governmental units, only to the extent that such claims are for—
> (C) a tax required to be collected or withheld and for which the debtor is liable in whatever capacity.
> Then 11 U.S.C. § 523(a)(1)(A) provides the following:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
> (1) for a tax or customs duty—
> (A) of the kind and for the periods specified in section 507(a)(2) or 507(a)(7) of this title whether or not a claim for such tax is filed or allowed; ...

must be determined whether the debtor or the creditor bears the burden of proof in establishing an objected-to claim in the bankruptcy context. Second, the burden for the Section 530 safe harbor must be allocated.

To establish an objected-to claim, both liability and specific amount must be proven. Therefore, the burden of proving whether workers are "employees" or "independent contractors" under the common law factors is subsumed in the liability aspect of this question. Additionally, the burden of persuasion on two abatement programs under the Internal Revenue Code must also be subsumed in the amount part of proof-of-claim litigation proof.

To sum up, the Internal Revenue Service has the ultimate burden of proving both the debtors' liability to IRS and the specific amount due. This plainly alters the normal burden of proof in a tax case. Ordinarily, the taxpayer would have to establish, in the face of an IRS challenge, that his workers were independent contractors.

However, the debtor would have the burden of proving entitlement to the Section 530 "safe harbor," which would be viewed as an affirmative defense in this objection-to-claim litigation.

A. *In bankruptcy, the Internal Revenue Service has the ultimate burden of proving that the liability alleged on its proof of claim is indeed owed by the debtor—whether the taxes are assessed or unassessed.*

1. The IRS, like any creditor, has the burden of proving an objected-to claim, even when it has assessed the taxes prior to bankruptcy.

■ Under 11 U.S.C. § 502(a)[7] and Bankr.R. 3001(f),[8] a properly executed proof of claim filed by a creditor in a bankruptcy case constitutes *prima facie*

evidence of the correctness of that claim. However, when an objecting party presents contradictory evidence at least equal to that contained in the proof of claim, that burden shifts. Thus, once an objector clears that initial hurdle, it is up to the creditor to prove first, that the debtor owes; and secondly, how much is owed. That is the position taken by *Collier on Bankruptcy*, the most respected treatise on bankruptcy law.[9]

In this case, the creditor is the Internal Revenue Service. However, that does not change the ultimate allocation of the burden of persuasion. The Fifth Circuit Court of Appeals considered the burden of proof issue on a state tax claim in *Matter of Fidelity Holding Co., Ltd.*, 837 F.2d 696 (5th Cir.1988):

The state argues that where a tax authority files for delinquent taxes, both federal and California cases hold that the burden of proof rests with the taxpayer. *See, e.g. Keogh v. C.I.R.*, 713 F.2d 496, 501 (9th Cir.1983). Although this principle may hold true as a general tenet, an exception plainly exists under the Bankruptcy Code. *See In re L.G.J. Restaurant*, 27 B.R. 455 ([Bkrtcy.] E.D.N.Y.1983). Under Bankruptcy Rule 301(b), (now Bankr.R. 3001(f)) a party correctly filing a proof of claim is deemed to have established a prima facie case against the debtor's assets. *In re WHET, Inc.*, 33 B.R. 424, 437 ([Bkrtcy.] D.Mass.1983). The objecting party must then produce evidence rebutting the claimant or else the claimant will prevail. *Id.* at 437. If, however, evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to "prove the validity of the claim by a preponderance of the evidence." The ultimate burden of proof *always rests upon the claimant. Id. This bur-*

---

7. 11 U.S.C. § 502(a) provides the following:
 (a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

8. Bankr.R. 3001(f) provides the following:

**Evidentiary Effect.** A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.

9. *See* 3 Lawrence P. King, Collier on Bankruptcy, § 502.01[3] (15th ed. 1991).

*den does not shift even where the claimant is a state or federal tax authority.* (emphasis added)

*Fidelity Holding* at 698.

In the *Fidelity Holding* case, the state tax claim included an assessment completed before the bankruptcy petition brought the automatic stay into existence.[10] The assessment strengthens the presumption of correctness that all creditors' proofs of claims carry. However, in bankruptcy, the ultimate burden of persuasion rests with the creditor—even when that creditor is the United States government with a valid assessment against the debtor.

2. In the Rasbury case, the IRS did not assess the taxes it claims before the bankruptcy petitions were filed, therefore no presumption of regularity attaches to the claimed amount.

The case law is even clearer in the bankruptcy context where a taxing authority as claimant failed to make an assessment before the bankruptcy petition was filed.[11] In *United States v. Kontaratos*, 36 B.R. 928 (D.Me.1984), the United States District Court discussed the weight that a valid commissioner's assessment gives to the presumption given an IRS proof of claim:

> There are several reasons that the courts have given to support this presumption. One reason has been that it is presumed that the IRS Commissioner who makes the assessment has done so in good faith and with sufficient evidence at his disposal to "satisfy a just and fair-minded person that such assessment ought to be made." *United States v. Rindskopf*, 105 U.S. 418, 26 L.Ed. 1131 (1881). The presumption of correctness afforded an assessment by the Commissioner encourage (sic) taxpayers to keep accurate records and to avoid the necessity of the

government to borrow money to cover the unpaid taxes and to initiate litigation for their recovery. *United States v. Rexach*, 482 F.2d 10, 17 (1st Cir.1973).

*Kontaratos* at 930, n. 4.

(It should be noted at this point that *In re Terrell*, 75 B.R. 291 (D.N.D.Ala.1987) (cited by the IRS) dealt with burden of proof in the context of whether an *individual* should be held responsible for *corporate tax debts* under 26 U.S.C. § 6672 and whether the tax debts were dischargeable. That case is not relevant to litigation of an objected-to proof of claim. *Terrell* concerned *who* owed the taxes, not *whether* taxes were owed. There is no binding authority in the Eleventh Circuit on burden of proof in an objected-to claim for unassessed taxes.)

The *Kontaratos* court stated its reasoning succinctly:

> In this case, there has been *no* assessment made. The proof of claim clearly states "Assessment Prohibited by B/C Section 362(a)(6)." A presumption of correctness is accorded a proof of claim *only* because there has been a valid assessment. Since no assessment has been made in this case and one is prevented by the automatic stay, it follows that the proof of claim is not entitled to any presumption of correctness. Its contents are, on these facts, nothing more than allegations of facts pertinent to the claim. The proof of claim has no controlling evidentiary weight on the ultimate issue of liability of the debtor for the taxes claimed.

*Kontaratos* at 931.

Consequently, it seems clear the IRS has the burden of proof to establish by a preponderance of the evidence first, that Billie

---

**10.** For further discussion of the specific circumstance where the Internal Revenue Service with a valid assessment is the claimant, *see* two other opinions: *In re Motor Freight Express*, 1988 WL 47601 (apparently unpublished) (Bankr.E.D.Pa. 1988) and *In re BKW Systems, Inc.*, 1989 WL 201206, 90–1 USTC P 50,139 (Bankr. D.N.H.1989). Both stand for the principle that the IRS bears the ultimate burden of proving an objected-to claim, even when it made an assessment prior to bankruptcy.

**11.** *See United States v. Kontaratos*, 36 B.R. 928 (D.Maine 1984); *In re Premo*, 116 B.R. 515 (Bankr.E.D.Mich.1990); *Matter of Unimet Corp.*, 74 B.R. 156 (Bankr.N.D.Ohio 1987); *Matter of L.G.J. Restaurant, Inc.*, 27 B.R. 455 (Bankr. E.D.N.Y.1983); *In re Coleman American Companies, Inc.*, 26 B.R. 825 (Bankr.D.Ka.1983) and *In re Twomey*, 24 B.R. 799 (Bankr.W.D.N.Y.1982).

Vester Rasbury and Bill's Forestry Service are liable for unpaid employment taxes because of a misclassification of employees as independent contractors and, second, exactly how much of such taxes, interest and penalties are owed.

B. *The bankruptcy proof-of-claim context alters the taxpayer's normal burden to prove his workers are independent contractors.*

■ As with many other tax related issues, the burden is normally on the taxpayer to establish that his workers are independent contractors when that status has been challenged by IRS. *See Illinois Tri-Seal Products Inc. v. United States*, 353 F.2d 216, 173 Ct.Cl. 499 (1965) and *Beatty v. Halpin*, 267 F.2d 561 (8th Cir.1959).

However, as noted above, in the bankruptcy context that normal burden is subsumed into the allocation of proof for an objected-to claim. Here, the burden of persuasion is always on the claimant once the objector has raised at least as much evidence as offered by the proof of claim.

C. *Since IRS must prove amount owed, it had the burden of establishing whether the taxpayer was due abatement under 26 U.S.C. §§ 3402(d) and 6521, or under 26 U.S.C. § 3509(a); and whether penalty should be applied.*

■ In addition to liability, a challenged claimant in bankruptcy must prove exactly how much it is owed by the debtor. In this case, it would thus be up to IRS to prove that the amount it seeks should stand— regardless of application of either of the abatement schemes mentioned in the course of this trial. Those schemes include abatements under 26 U.S.C. §§ 3402(d) and 6521; and another abatement program placed in the code more recently at 26 U.S.C. § 3509(a).

The same logic must apply to the penalty sought in this proof of claim. Unless it establishes the debtor's liability for and amount of penalty, IRS cannot meet its burden for proving amount on proof of claim.

D. *Billie Vester Rasbury and Bill's Forestry Service have the burden of proving that the firm's arrangement with crew members for the years in question is entitled to Section 530 "safe harbor" status by a preponderance of the evidence.*

■ Billie Vester Rasbury and Bill's Forestry Service have the burden of establishing that they are entitled to the protection of the "safe harbor" provisions of Section 530 of the 1978 Revenue Act in the event such proof is needed to refute an IRS reclassification.

Use of Section 530 functions basically as a defense against liability determined by the Internal Revenue Service for misclassification of workers as "independent contractors" instead of "employees". As noted by the 1990 House report, "When an employer is not protected by one of the three Section 530 safe harbors, IRS applies the 20 'common law' factor test, first established in the Social Security Act of 1935, and since incorporated into the Internal Revenue Manual." [12]

*Collier on Bankruptcy* [13] is equally explicit on the subject of defenses applied in litigation on objected-to proofs of claim:

> Thus, normally, the trustee as the objector would have the burden of proving any affirmative defense such as the statute of limitations, usury, a transfer to the creditor constituting a voidable preference or a fraudulent conveyance and any set-off or counterclaim.

This is the conclusion reached by the United States District Court in *In re McAtee*, 115 B.R. 180 (D.N.D.Iowa 1990). That court noted at 182: "As Section 530 is essentially a defense to an otherwise valid claim, the court finds that the burden of showing entitlement to the protection of Section 530 properly rests on the debtor, the party claiming the protection." (On remand, the Bankruptcy Court held a full evidentiary hearing and determined that the debtor in this case had not met his burden to attain Section 530 protection; but that the IRS had met its burden of

---

**12.** H.R.Rep. No. 979, 101st Cong., 2d Sess. (1990), 1990 WL 201643 (Leg.Hist.), *31.

**13.** *See* 3 Lawrence W. King, Collier on Bankruptcy, § 502.01[3] (15th ed. 1991).

demonstrating that the debtor's truck drivers were employees instead of independent contractors. *In re McAtee,* 126 B.R. 568 (Bankr.N.D.Iowa 1991).)

Billie Vester Rasbury and Bill's Forestry Service, Inc. have the burden of proving by a preponderance of the evidence that Section 530 protects them from liability for any misclassification of crew members for 1986, 1987 and 1988.

To sum up the issues and the burdens of proof allocated by the court for the rest of this discussion:

| ISSUE | PARTY WITH BURDEN OF PROOF |
|---|---|
| II. **LIABILITY ON PROOF OF CLAIM:** | IRS |
| (Independent contractor v. employee) | |
| III. **AMOUNT ON PROOF OF CLAIM:** | |
| A. Abatement under §§ 3402(d), 6521(a) | IRS |
| B. Abatement under § 3509(a) | IRS |
| C. Penalties | IRS |
| IV. **DEFENSE UNDER § 530(a)(2)(C):** | Taxpayer |

## II.

### THE IRS FAILED TO MEET ITS BURDEN OF PROVING THAT BILL'S FORESTRY CREW MEMBERS WERE IMPROPERLY CLASSIFIED AS INDEPENDENT CONTRACTORS

█ The IRS generally applied the twenty (20) common law factors in making its determination that crew members working for Bill's Forestry in the 1980s should have been classified as employees, rather than independent contractors. The House Committee on Government Operations in its October of 1990 report recognized a problem with inconsistent and subjective application of the twenty factors. The committee reported to the House of Representatives as a whole:

The drywall industry in Florida provided probably the best example of the subjective nature of the common law factors. Two companies doing business similarly were treated differently by IRS with respect to the classification of subcontractors. One company was forced to reclassify by the IRS after being scrutinized using the 20 common law factors, while the other company received a letter from IRS which stated "It is concluded, upon the basis of the stated facts in this instant situation, that the company does not exercise, nor does it have the right to exercise such direction and control over the individual in the performance of his services to the extent necessary to establish the relationship of employer-employee under the usual common law rules.... Accordingly, it is concluded that the individual was self-employed and all receipts received by the individual must be taken into account in computing net earnings for self employment income." The common thread that makes this example so illustrative of the problem with the common law factors is that the worker in question is the same person, doing the same type of work for each employer. The only apparent difference between the two cases was the IRS examiner who evaluated each case using the 20 common law factors. The point made by TECNA (Technical Consultants National Association) concerning how an IRS examiner may subjectively apply the facts is clearly illustrated by this example.

1990 WL 201643 (Leg.Hist.) *32–3.

The House report called for discussions between IRS and the private sector to clarify the twenty factors so they might be applied more objectively and consistently from company to company.

A. *E.C. Jones v. United States, 79–1 USTC P 9120 (D.E.D.Tex.1978) found that cutters on logging crews were properly classified as independent contractors.*

While there is much law on the general independent contractor v. employee issue, there is little guidance in the particular

area of logging crew members. However, in *E.C. Jones v. United States*, 79–1 USTC P 9120, 1978 WL 1245 (D.E.D.Tex.1978), the U.S. District Court held that Jones, a logging contractor, properly treated a tree cutter as an independent contractor rather than as an employee. The court held that the IRS was not entitled to recover any of the employment taxes it had asserted against Jones in its counterclaim to his suit asking for a refund. The refund was granted.

At trial court level, the District Court also held that Jones was not entitled to an award of attorney's fees against IRS, because it found he did not show the government's conduct was "frivolous, unreasonable or based on bad faith."

However, on appeal, the Fifth Circuit Court of Appeals reversed the trial court on the issue of the attorney's fees. It found that Jones should have been awarded his attorney's fees against IRS because although IRS had information in its own records to show that the tree cutter had already paid the taxes in question, it still asserted the full amount against the taxpayer:

> In the instant case, Jones introduced income tax returns establishing that Morton paid his own withholding and FICA taxes. Although IRS had proof *in its own records* that Jones did not owe FICA and withholding taxes, it persisted in advancing as a counterclaim that was the epitome of a frivolous and unreasonable lawsuit. The government conceded that it had posted a lien and counterclaimed for a sum far in excess of the amount it believed to be due as an "attention-getter" or bargaining wedge. The amount sought was almost seven times the amount which could have been contested in good faith. Less than $1,500 of FICA taxes was actually in dispute.

*E.C. Jones v. United States*, 613 F.2d 1311, 1313–14, 80–1 USTC P 9291, 83,629 (5th Cir.1980).

The *Jones* case is indistinguishable factually from the Rasbury/Bill's Forestry scenario—including the fact that the IRS has not determined from its own records whether it is actually owed any back taxes.

With *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981), the Eleventh Circuit adopted the prior opinions of the old Fifth Circuit as binding authority. Consequently, this court finds the Fifth Circuit's view of application of the common law factors and of IRS' responsibility for determining tax liability controlling.

**B.** *Crew members working with Bill's Forestry in the 1980s were properly classified as independent contractors under relevant common law factors.*

■ This court will apply the twenty factors used by IRS, adding four other factors to make the analysis more representative. In the Bill's Forestry case, the factors are evaluated in the following ways:

1. *Instructions:* Logging workers are an independent breed, historically determining when and how they will work. Mr. Rasbury assigned workers to a tract—but the crews set their own time of work and chose their own method to remove the timber.

2. *Training:* There is no specific training for logging workers. Such workers train on the job to develop a high degree of skill in cutting, bunching, loading and transporting logs to the mill.

3.—*Integration:* Only the end result of crew members' services—delivery of the logs that fulfilled his contracts—were integrated into Rasbury's business.

4. *Services Rendered Personally:* Workers cooperate as a team to achieve the greatest productivity since individual team members are paid on a per-ton basis.

5. *Hiring, Supervising and Paying Assistants:* This factor cannot be fully applied in this context since crew members did not have control of Bill's Forestry assets. However, crew members did testify that they hired other crew members and terminated those who let the team down.

6. *Continuing Relationship:* It is common for logging crew members to have a long-standing relationship with one logging contractor. But it is also common for workers to leave one contractor and go to

another producer, or to work for more than one contractor at a time.

7. *Set Hours of Work:* Mr. Rasbury did not set hours of work. Normally, the team decided when it would start work, when it would finish. The schedule was flexible depending on the number of tons the team wished to produce.

8. *Full Time Required:* The crew members, part of a team concept, had to work as the team chose to achieve maximum production. However, when the team was not working, crew members were free to work for others, particularly on weekends.

9. *Doing Work on Employer's Premises:* All of the Bill's Forestry work was on tracts assigned by various mills.

10. *Order or Sequence (of tasks) Set:* Cutters, skidders, loaders and truck drivers set the sequence to achieve one result, to be paid based on a per-ton computation.

11. *Oral or Written Reports:* None were required.

12. *Payment by Hour, Week or Month:* The team (consisting of cutters, skidders, loaders and truck drivers) were paid by the ton for log production work, an important indication of independent contractor status. Basing compensation on production increases the economic efficiency of business, as Mr. Rasbury told the court. He also testified that production has gone down since he yielded to IRS and reclassified his workers as hourly employees.

13. *Payment of Business and/or Travel Expenses:* None of the workers were paid expenses of any kind, another indicator of an independent contractor relationship.

14. *Furnishing of Tools and Materials:* Rasbury and Bill's Forestry furnished the heavy equipment. However, some of the truck drivers brought their own trucks. Other crew members furnished their own saws, hardhats and other safety equipment.

The court must reject government witness Rolston's conclusive "bare hands" test of status. Rolston would draw a line between those who brought only their "bare hands" to the job—"employees"; and those who brought their own tangible equip-

ment—"independent contractors". It is not that simple. Many skilled professionals and craftspersons who operate as independent contractors carry their best, though intangible, tools inside their heads. So it is with logging crew members.

15. *Significant Investment:* Crew members who supplied their own trucks, chain saws, safety gear or other equipment should be viewed as having a significant investment.

16. *Realization of Profit or Loss:* Since the crew members were paid by the ton and no expenses paid, their realization of profit would depend on the volume of timber cut and removed against expenses.

17. *Working for More than One Firm at a Time:* Crew members could and did work for more than one firm at a time.

18. *Making Service Available to the General Public:* Workers advertise their skills to logging producer firms through word of mouth.

19. *Right to Discharge:* Since the team was paid on a per-ton basis, the team did, in effect, discharge workers if they were not pulling their share of the load. There was testimony that Mr. Rasbury, on occasion, did hire and fire some workers.

20. *Right to Terminate:* Each crew member had a right to terminate his relationship with Bill's Forestry at any time, an indicator of an employer/employee relationship.

The court determines that the twenty factors reviewed above are not all-inclusive. This court suggests that at least *four* more are useful in putting the independent contractor v. employee classification in its clearest perspective.

They include the following:

21. *Industry Practice or Custom:* It was the widespread, almost universal, custom to classify such workers as independent contractors in the West Alabama logging industry in the 1980s. *See* James L. Rigelhaupt Jr., Annotation, *What Constitutes Employer–Employee Relationship for Purposes of Federal Income Tax With-*

*holding,* 51 A.L.R.Fed. 59 § 19 (1981 & Supp.1990).

**22.** *Intent of the Parties—How They Viewed the Relationship:* It is plain from the evidence that most crew members and Rasbury intended to create an independent contractor relationship. *See Id.* § 17.

**23.** *Written, Signed Independent Contractor Agreements:* All of the parties employed as crew members by Bill's Forestry signed written agreements designating themselves as independent contractors. Further, ninety-four (94) percent of them, after the fact, signed forms 4669 attesting they had paid their own taxes on the money paid them by Bill's Forestry.

While such documentary evidence is not conclusive, it is an important factor indicating intent of the parties and pointing toward an independent contractor status. *See Id.* § 13.

**24.** *Employee-type Benefits Provided?:* Benefits indicating employee status include paid vacation, sick leave, medical insurance, pension accrual, etc. With the exception of a limited Workman's Compensation Insurance program, Bill's Forestry provided crew members with no employee-type benefits. Evidence indicated that the Workman's Compensation participation was required as a condition of Bill's Forestry's contracts with large log consumers. This factor alone does not indicate an employer/employee relationship in the absence of all other employee-type benefits. *See Id.* § 18.

After a detailed analysis of the Bill's Forestry evidence under these *twenty-four* (24) factors, it is the court's conclusion that Rasbury and his company were not misclassifying their crew members as independent contractors for the years in question. Consequently, neither Rasbury nor his company has any liability for failing to withhold employment taxes for 1986, 1987 and 1988.

### III.

THE IRS FAILED TO PROVE THE AMOUNT ON ITS PROOF OF CLAIM BECAUSE IT NEVER ESTABLISHED A SPECIFIC AMOUNT DUE—TAXES, INTEREST, PENALTY AFTER ANY ABATEMENT

A. *Evidence concerning abatement of the alleged liability under Sections 3402(d) and 6521(a) left many unanswered questions—including whether it should have applied or not.*

■ Since the IRS, like any similarly challenged claimant, has the burden of proving the amount owed by the debtor, it would also have the burden of defining which, if any, abatement would be applied to the alleged liability—or proving that none should apply.

26 U.S.C. §§ 3402(d) [14] and 6521(a) [15] provide an abatement scheme whereby the

**14.** Section 3402(d) provides the following:

**Tax paid by recipient.**
If the employer, in violation of the provisions of this chapter, fails to deduct and withhold the tax under this chapter, and thereafter the tax against which such tax may be credited is paid, the tax so required to be deducted and withheld shall not be collected from the employer; but this subsection shall in no case relieve the employer from liability for any penalties or additions to the tax otherwise applicable in respect of such failure to deduct and withhold.

**15.** Section 6521(a) provides the following:

**(a) Self-employment tax and tax on wages.** In the case of the tax imposed by chapter 2 (relating to tax on self-employment income) and the tax imposed by section 3101 (relating to tax on employees under the Federal Insurance Contributions Act)—

(1) If an amount is erroneously treated as self-employment income, or if an amount is erroneously treated as wages, and
(2) If the correction of the error would require an assessment of one such tax and the refund or credit of the other tax, and
(3) If at any time, the correction of the error is authorized as to one such tax but is prevented as to the other tax by any law or rule of law (other than section 7122, relating to compromises),
then, if the correction authorized is made, the amount of the assessment, or the amount of the credit or refund, as the case may be, authorized as to the one tax shall be reduced by the amount of the credit or refund, or the amount of the assessment, as the case may be, which would be required with respect to such other tax for the correction of the error if such credit or refund, or such assessment of such other tax were not prevented by any law

amount assessed against an employer for failure to withhold employment taxes from a worker's pay would be reduced by the amount of taxes the worker actually paid. In other words, the two sections would reduce the amount of taxes owed by an employer like Rasbury to the amount the government was actually due. *See Jones v. United States*, 80-1 USTC 83,628 (5th Cir.1980).

There was evidence that IRS Agent Connie Brown asked Rasbury and his accountant, Collins, to get the workers paid as independent contractors to sign forms 4669, attesting that they had paid their own income and self-employment taxes. She indicated that signature of the forms would result in the abatement described above, Collins testified.

As did the logging contractor in the *Jones* case, Mr. Rasbury spent time, energy and money getting ninety-four (94) percent of the workers in question to sign the forms. Then the idea of Sections 3402(d) and 6521(a) abatement seemed to vanish from the record of this case until the hearing.

In answer to a question from the court, Ms. Brown said she knew of no attempt by IRS to follow up on the forms 4669 she had asked Mr. Rasbury to secure, to determine if taxes had actually been paid on the independent contractor payments Bill's Forestry reported on forms 1099.

Such information would be contained in government records, which should be easily available to IRS, but not to members of the public like Mr. Rasbury. There is no answer in the record about why the IRS asked Rasbury to produce the forms 4669 if it was not going to reduce the retroactive liability by the taxes actually paid.

What is clear from the record is that IRS has no figures showing how much, if any, of these taxes are *actually still owed* the United States of America. The total included in its proof of claim for 1986, 1987 and 1988 is the maximum that *might* be unpaid—if none of the workers paid as independent contractors had paid any taxes at all.

That is the exact situation found by the Fifth Circuit in *Jones* which the appeals court, awarding the taxpayer his attorney's fee, called IRS' counterclaim "the epitome of a frivolous and unreasonable lawsuit." 613 F.2d at 1313.

B. *There is no definitive proof in evidence about application of Section 3509(a) abatement, an alternative scheme for determining amount of tax liability.*

The Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) [16] adopted 26 U.S.C. § 3509 which provides an alternative abatement computation to the Sections 3402(d) and 6521(a) reduction. (*See* Section 3509(d)(1)(C).) Under Section 3509(a),[17] a taxpayer's liability for failing to withhold employment taxes would be computed at a reduced rate by applying a mathematical formula to the maximum tax which might be due. The taxpayer would pay one and one-half percent of the wages paid and twenty (20) percent of the Social Security tax due for that amount of pay.

The IRS contends that, in the event liability is found, the Section 3509 abatement is not available to Rasbury and Bill's Forest-

---

or rule of law (other than section 7122, relating to compromises).

**16.** S.Rep. 494(I), 97th Cong., 2d Sess. (1982) 1982 WL 25047, *678, U.S.Code Cong. & Admin.News 1982, p. 781.

**17.** Section 3509(a) provides the following:
(a) **In general.**
If an employer fails to deduct and withhold any tax under chapter 24 or subchapter A of chapter 21 with respect to any employee by reason of treating such employee as not being an employee for purposes of such chapter or

subchapter, the amount of the employer's liability for—
(1) **Withholding taxes.** Tax under chapter 24 for such year with respect to such employee shall be determined as if the amount required to be deducted and withheld were equal to 1.5 percent of the wages (as defined in section 3401) paid to such employee.
(2) **Employee social security tax.** Taxes under subchapter A of chapter 21 with respect to such employee shall be determined as if the taxes imposed under such subchapter were 20 percent of the amount imposed under such subchapter without regard to this paragraph.

ry because it argues the debtors intentionally disregarded the withholding law.[18] The overwhelming weight of the evidence shows that the taxpayer did not intentionally disregard the withholding law in his classification of workers as independent contractors. Consequently, if it had been needed, this abatement would have been available to Mr. Rasbury and Bill's Forestry.

Although IRS has the burden of proof on this issue since it affects the amount of its proof of claim, the agency did not put into evidence at hearing a computation of liability under Section 3509. Such liability was computed in the IRS pretrial brief at Page 12 as follows:

| Taxable Period | Type of Tax | Amount of Tax | Penalty | Total |
|---|---|---|---|---|
| 1986 | 940 | $ 4,231.90 | $ 423.19 | $ 4,655.09 |
| 1986 | 941 | $ 8,220.65 | $ 583.11 | $28,556.13 |
| 1987 | 940 | $ 6,450.84 | $ 645.08 | $ 7,095.92 |
| 1987 | 941 | $14,410.99 | $1,022.20 | $50,059.54 |
| 1988 | 940 | $ 7,301.85 | $ 730.19 | $ 8,032.04 |
| 1988 | 941 | $18,540.81 | $1,324.84 | $63,103.97 |
| TOTALS: | | $59,157.04 | $4,728.61 | $63,885.65 |

C. *IRS failed to establish that it was due penalty or even to explain the total penalty sought in its proofs of claim.*

 As previously stated, the burden is on IRS, as proponent of its proof of claim, to establish that a debtor/taxpayer is liable to it at all and then to prove the exact amount owed. Since the IRS has failed to establish Rasbury/Bill's Forestry's liability, no penalties are due.

However, even given a finding of liability, IRS failed its burden to establish that it was due penalty. For the only staff witness for IRS, Connie Brown, testified that she did not know how the penalty sought in the IRS proof of claim was computed.

For both reasons stated above, there is no penalty due.

D. *The IRS has failed to meet its burden of proof for a proof of claim in bankruptcy in that it has proved neither liability nor amount.*

As noted in the introduction to this discussion, in certain circumstances retroactive liability for withholding taxes, interest and penalty may be justified by valid public policy concerns. The most persuasive of those concerns are 1. that the government collect all *taxes which are due it;* and 2. that social security type benefits be funded for all workers.

In this case, IRS failed to establish that Billie Vester Rasbury and Bill's Forestry had misclassified its workers under the common law factors. Thus the court may not find the debtors liable for any taxes, interest and penalty for the alleged misclassification.

Further, the court is lacking the very information needed to justify the crushing liability the government seeks to fix on Rasbury and Bill's Forestry. IRS has not shown that it is actually owed any money at all on the compensation paid workers by Bill's Forestry in 1986, 1987 and 1988.

Billie Vester Rasbury and Bill's Forestry thus owe the government nothing on this proof of claim since IRS has failed to prove either liability or amount.

18. Section 3509(c) provides:
(c) **Section not to apply in cases of intentional disregard.**
This section shall not apply to the determination of the employer's liability for tax under Chapter 24 or subchapter A of Chapter 21 if such liability is due to the employer's intentional disregard of the requirement to deduct and withhold taxes.

## IV.

### THE "SAFE HARBOR" OF SECTION 530 WOULD ALSO HAVE APPLIED TO BILL'S FORESTRY IN THE 1980S

 Section 530(a) of the Revenue Act of 1978, as amended by the Tax Equity and Fiscal Responsibility Act of 1982, was placed on the books in reaction to what Congress perceived as an overzealous initiative by the Internal Revenue Service against employers it deemed to have misclassified workers as independent contractors. Congress intended the section to serve as a temporary respite sheltering those who had acted in good faith from catastrophic retroactive liability.

So far, the "temporary" measure has been on the books thirteen years. It is included in the code as a note to 26 U.S.C. § 3401.

While some variations can be read into the meaning of the words of the statute, the intent of Congress, in 1978 and up to 1991 seems clear. Although Congress wished taxes withheld properly and properly collected by IRS, it did not wish the "twenty common law factors" to be applied so subjectively that hardship resulted for businesses which had acted in good faith.

The House Committee on Government Operations report, "Tax Administration Problems Involving Independent Contractors," was adopted by the House of Representatives as a whole on January 2, 1991.[19] That report strongly endorsed the "industry practice" safe harbor of Section 530—while recommending that Congress consider rescinding the "prior audit" haven because of its potential for abuse:

> While the GAO (a General Accounting Office report in 1989 that apparently recommended doing away with all three Section 530 "safe harbors") recommendation would seem to also apply to the judicial precedent and industry practice safe harbor restrictions, the subcommittee believes that *employers who have made classification decisions based on a spe-*

cific government ruling or industry practice should be afforded the protection now provided by Section 530. Indeed, industry representatives logically argue that a government ruling on a specific situation, or *a widely followed industry practice* usually results in accurate and honest classification decisions. (emphasis added)[20]

This subcommittee and committee, perceived the Section 530 analysis as the IRS' first step in determining whether an employer had misclassified his workers. If the Section 530 safe harbor applied, the report said, the IRS should never get to the "20 common law factors." For example:

> IRS complains that Section 530, which was extended indefinitely by the Tax Equity and Responsibility Act (TEFRA) of 1982, restricts the extent to which it can examine and reclassify workers. IRS points to the "safe harbor" provisions of Section 530 as the cause. The safe harbor provisions *eliminate an employer's liability for employment taxes arising from an employment relationship* if the employer had a "reasonable basis" for treating the worker as an independent contractor, filed the necessary information returns, and has not treated any other substantially similar worker as an employee ... If a *company cannot claim protection under one of the safe harbor provisions, then IRS is free to scrutinize the employer's classification decision against 20 "common law" factors, first adopted in the Social Security Act of 1935 and currently contained in the Internal Revenue Manual.* The 20 factors revolve around the degree or right of control an employer has over workers, such as their hours, space and training. GAO, however, notes that "in determining the proper classification, these factors can be subjective."[21]

The House committee's concluding recommendation called on Congress as a whole to explore the possibility of enacting

---

**19.** H.R.Rep. No. 979, 101st Cong., 2d Sess. (1990), 1990 WL 201643 (Leg.Hist.).

**20.** *Id.,* 1990 WL 201643 (Leg.Hist.), *30–1.

**21.** *Id.,* 1990 WL 201643 (Leg.Hist.), *8–9.

a one-time amnesty or prospective reclassification program for employers who acted in good faith by filing all the required Forms 1099—but still were found by IRS to have flunked the Section 530 safe harbor, and subsequently, the twenty common law factors.

This expression of Congressional intent on Section 530 underscores the policy behind the adoption of the section—that the reasonable basis analysis should be construed liberally in favor of the taxpayer.[22]

A. *Section 530 requires that a qualifying taxpayer have treated its workers consistently for tax purposes and that the classification was "reasonable."*

▆▆▆ The much-disputed text of Section 530(a)(1) in pertinent part is as follows:

(a) Termination of certain employment tax liability.—

(1) In general.—If—

(A) for purposes of employment taxes, the taxpayer did not treat an individual as an employee for any period, and

(B) in the case of *periods after December 31, 1978, all federal tax returns (including information returns) required to be filed by the taxpayer with respect to such individual for such period are filed on a basis consistent with the taxpayer's treatment of such individual as not being an employee,* then for purposes of applying such taxes for such period with respect to the taxpayer, the individual shall be deemed not to be an employee *unless the taxpayer had no reasonable basis for not treating such individual as an employee.* (emphasis added)

Then Section 530(a)(2) goes on to list three specific statutory "safe harbors" by which the challenged taxpayer can prove he/she acted with a "reasonable basis." They include:

(2) Statutory standards providing *one method* of satisfying the *requirements of paragraph (1).*—For purposes of paragraph (1), a taxpayer shall *in any case* be treated as having a *reasonable basis* for not treating an individual as an employee for a period if the taxpayer's treatment of such individual for such period was in *reasonable reliance* on *any* of the following:

(A) judicial precedent, published rulings, technical advice with respect to the taxpayer, or a letter ruling to the taxpayer;

(B) a past Internal Revenue Service audit of the taxpayer in which there was no assessment attributable to the treatment (for employment tax purposes) of the individuals holding positions *substantially similar* to the position held by this individual; or

(C) *long-standing recognized practice of a significant segment of the industry* in which such individual was engaged. (emphasis added)

Case law gives differing views on "consistent". The wording of the statute above raises the question of whether there are two prongs or one to the test a taxpayer must pass to use the Section 530 "safe harbor". The government would contend and some case law [23] seems to suggest that a taxpayer cannot avail himself of Section 530 if he has treated any of the workers as other than independent contractors during any tax period since December 31, 1978.

However, other cases [24] have interpreted the statute differently. As can be noted in the text of this statute, Section 530(a)(2) refers to the three safe harbors listed in 530(a)(2)(A) and (B) as "one method of satisfying the *requirements* (plural not singular) of paragraph (1)."

The House Committee on Government Operations in the report cited above defined it this way: "The safe harbor provisions eliminate an employer's liability for

---

**22.** H.R.Rep. No. 1748, 95th Cong., 2d. Sess. 5 (1978).

**23.** *See In re McAtee,* 115 Bankr. 180 (D.N.D.Iowa 1990) and *Ridgewell's, Inc. v. United States,* 655 F.2d 1098, 228 Ct.Cl. 393 (1981).

**24.** *See Lambert's Nursery and Landscaping, Inc. v. United States,* 894 F.2d 154 (5th Cir.1990); *General Inv. Corp. v. United States,* 823 F.2d 337 (9th Cir.1987); *Henry v. United States,* 793 F.2d 289 (Fed.Cir.1986) and *C.D. Ulrich, Ltd. v. United States,* 692 F.Supp. 1053, 88–1 USTC P 9318, 83,817 (D.Minn.1988).

employment taxes arising from an employment relationship if the employer has a 'reasonable basis' for treating the worker as an independent contractor, filed the necessary information returns, and has not treated any other *substantially similar* worker as an employee."

"Reasonable" has also been defined by the statute as well as cases. The statute itself, at Section 530(a)(2)(A), (B) and (C) lists three ways that a challenged taxpayer can raise a conclusive presumption that it classified its employees "reasonably" and thus escape reclassification. To repeat, these include reliance on judicial precedent, published rulings, technical advice, or a letter of ruling to the taxpayer; reliance on a past IRS audit which resulted in no assessment and by showing a longstanding recognized practice of a "significant segment" of an applicable industry.

The three statutory standards are not exclusive. Section 530(a)(2) refers to them as "Statutory standards providing *one method*" (emphasis added) of escaping liability for a good-faith misclassification.

B. *Section 530 would apply to Bill's Forestry since the proper information forms were filed, the classification of workers as independent contractors was consistent for production work and was reasonable in the light of industry practice.*

Rasbury and Bill's Forestry filed the information returns required by the government for the years in question. In fact, the IRS claim is based on the information Rasbury himself provided to the government with the forms 1099. As an additional sign of good faith, Rasbury reclassified his crew members as employees beginning with the last quarter of 1989.

1. Rasbury and Bill's Forestry did treat workers consistently for tax purposes when they functioned in "substantially similar" roles.

There was conflict in testimony about how workers for Bill's Forestry were paid. However, the debtor offered more evidence and more credible evidence that crew members were paid by the ton of wood produced for work done in the woods, and by hourly wages for "rain day" equipment maintenance when weather made production work impossible; than the government did that they were not.

The government offered no specific evidence that any specific W2 was filed for any specific unit of wood production work performed by a crew member. Rasbury testified in some detail that workers were sometimes paid hourly wages for equipment maintenance when weather shut down actual logging production in the woods. The government did not refute this testimony on any specific basis.

The Section 530(a)(3) ban provides that relief is not available "if the taxpayer (or a predecessor) has treated any individual holding a *substantially similar position* as an employee for purposes of the employment taxes for any period."

Logging production work—cutting, skidding, bunching and hauling logs—is factually distinguishable from equipment maintenance. Logging and equipment maintenance are not "substantially similar position(s)." The debtors proved by a preponderance of the evidence that Bill's Forestry had not treated individuals as both employees and independent contractors while they held "substantially similar" positions.

2. Rasbury also showed by a preponderance of the evidence that it was widespread logging industry practice in West Alabama in the 1980s to pay logging crew members as independent contractors.

Rasbury/Bill's Forestry clearly proved by a preponderance of the evidence that in the 1980s, it was the widespread, almost universal, custom in the logging industry in West Alabama for logging contractors to treat crews as independent contractors rather than as employees. The debtors' witnesses were headquartered in four different counties in West Alabama, representing interests both within their home counties and outside.

This point was established by testimony from the debtor and longtime employees; but especially by the debtor's expert witnesses including: C.P.A.s Collins, Richardson, and Lawrence, and registered forester, Jacobs.

C. *Conclusion: the Section 530 "Safe Harbor" would be available to Billie Vester Rasbury and Bill's Forestry for 1986, 1987 and 1988.*

Billie Vester Rasbury and Bill's Forestry Service appear to be the very kind of taxpayer that Section 530 was enacted to protect: a business which had consistently classified certain workers as independent contractors until the IRS determined that they should be reclassified, that had filed its informational forms 1099 with IRS, and had acted reasonably in classifying its workers as independent contractors relying on widespread industry custom.

Thus, Section 530 would shield Bill's Forestry Service/Billie Vester Rasbury from retroactive withholding tax liability for tax years 1986, 1987 and 1988.

## CONCLUSION

The Internal Revenue Service has failed to meet its burden of proving both liability and amount on its proof of claim filed against the bankruptcy estates of Billie Vester Rasbury as an individual and of Bill's Forestry Service, Inc., as a corporation. Its proof of claim for retroactive withholding taxes (income, FICA and FUTA), interest and penalty for the years 1986, 1987 and 1988 is therefore due to be disallowed. The debtors' objection to claim is due to be sustained.

Additionally, the court finds that the "safe harbor" of Section 530 should have protected this taxpayer from retroactive liability regardless of whether the crews were properly classified.

This memorandum shall constitute findings of fact and conclusions of law pursuant to Bankr.R. 7052. A separate order shall be entered consistent with this opinion.

DONE AND ORDERED.