Martin L. SPRINGFIELD d/b/a
Douglas Motors, Plaintiff,

v.

UNITED STATES of America, Defendant.

UNITED STATES of America,
Counterclaim Plaintiff,

v.

Martin L. SPRINGFIELD d/b/a Douglas
Motors, Counterclaim Defendant.

Civ. No. 91–1764–AJB.

United States District Court,
S.D. California.

Dec. 9, 1994.

George N. Harris, Jr., Washington, DC, represented defendant/cross-claimant the United States of America.

Patricia A. Isaacs, El Cajon, CA, represented plaintiff/cross-defendant Martin L. Springfield dba Douglas Motors.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BATTAGLIA, United States Magistrate Judge.

This matter was called for trial on November 2, 1994. George N. Harris, Jr., represented defendant/cross-claimant the United States of America. Patricia A. Isaacs represented plaintiff/cross-defendant Martin L. Springfield dba Douglas Motors. On July 25, 1994, in accordance with the provisions of 28 U.S.C. § 636(c), the parties consented to have a United States Magistrate Judge conduct all further proceedings in this case.

### LEGAL ISSUES

1. Whether the statute of limitations bars the collection by the Internal Revenue Service of assessments for (a) Social Security Taxes, (b) unemployment taxes, (c) civil penalties, (d) failure to file penalties and interest, four years prior to 1988, 26 U.S.C. § 6501(a).

2. Whether the assessment of civil penalties under 26 U.S.C. § 6652, § 6676 and § 6722 were improper in this case.

3. Whether the salespeople were common law employees from 1983 through 1987 for federal employment tax purposes under applicable law.

4. Whether plaintiff is entitled to relief from liability for the tax assessment under the safe harbor provisions of § 530 of the Revenue Act of 1978, as amended and extended through the Tax Equity and Fiscal Responsibility Act of 1982, 1982–2 C.B. 462, 536.20, 26 U.S.C. § 3401.

5. Whether plaintiff's rights were violated by asking for and reviewing his business records and personal tax returns prior to an audit being opened.

6. Whether the doctrine of equitable estoppel should be applied under the circumstances of this case.

7. Whether the California Vehicle Code sections 285, 286, 675, 11700–11727, and 11800–11809, are applicable and relevant regarding the salespersons' status as employees and/or applicable to the analysis of relief under § 530.

After hearing the testimony, reviewing the documentary evidence and the agreed facts as set forth in the amended Pre-trial Order, and considering the arguments of counsel, the Court now makes the following findings based on the credible evidence and their reasonable inferences to be drawn therefrom. These findings were made based upon a preponderance of the credible evidence.

### FINDINGS OF FACT

1. This is a civil suit in which the plaintiff, Martin L. Springfield dba Douglas Motors, sought to recover withholding taxes, FICA taxes, FUTA taxes, penalties, and interest which he paid for the tax period ending September 30, 1986 in the total amount of $2,206.72. Springfield operated Douglas Motors, a used automobile business, and hired several individuals to sell vehicles from Douglas Motors' inventory.

2. Defendant, the United States of America, counterclaimed for the total balance of the assessments of tax, interest and penalties the IRS had made against the plaintiff. Specifically, the Government's counterclaim included FICA tax assessments for each of the taxable quarters ending during the years 1983, 1984, 1985, 1986, 1987 and 1988. In addition, the counterclaim included FUTA and certain civil penalty assessments for the same years. At trial, the total amount of the Government's counterclaim was $70,555.13,[1] plus interest and penalties from August 1, 1994.

3. Before the trial of this matter began, the plaintiff agreed the salespersons should have been treated as employees during 1988. As a result, with respect to the issue of

---

1. This counterclaim was presented at trial in the amount of $76,115.51 and later amended by stipulation.

whether the salespersons were employees, the dispute tried involved only the years 1983 through 1987, inclusive. The plaintiff contended he was entitled to the relief found in § 530 of the Revenue Act of 1978 with respect to all of the assessed taxes, including 1988.

4. The plaintiff purchased Douglas Motors, an established used car business, in 1981. Douglas Motors was operated by Mr. Springfield as a sole proprietorship.

5. The business was operated out of a warehouse in Santee, California, until February of 1988. The warehouse location included both indoor and outdoor space for displaying the vehicles to the public.

6. Between 1981 and 1983, Douglas Motors' business primarily consisted of purchasing automobiles at wholesale prices in the San Diego area, transporting many of the vehicles to the Los Angeles area, and reselling them at wholesale auctions. The difference in the prices which could be obtained in the wholesale markets provided the business with most of its operating profit.

7. After he purchased the business, Springfield entered into agreements with several persons whom he allowed to sell automobiles from Douglas Motors' inventory to retail customers and provided "Douglas Motors" business cards to at least one of these salespersons.

8. The nature of the relationship between the plaintiff and the salespersons did not change substantially between 1983 and 1989 and were typically long term relationships.

9. Plaintiff gave his salespeople keys to the Santee warehouse and allowed them to sell used cars from his business inventory.

10. All of the salespeople whom Springfield hired had extensive experience in the used automobile sales industry.

11. Potential retail customers would view Douglas Motors' automobiles at the Santee warehouse location and the salespersons would conduct the sales transaction on behalf of the business and under Douglas Motors' Dealers License. Mr. Springfield attracted retail customers by offering the vehicles for sale in a weekly used car magazine, the "Auto Trader."

12. Mr. Springfield spent very little time himself at the warehouse. His time and attention was devoted to wholesale activity and vehicle purchasing.

13. Douglas Motors' salespeople were paid on a commission-only basis, receiving no fixed salary. The plaintiff set and recorded a "cost" for each vehicle kept at the warehouse location. This was based on his cost purchasing the vehicle, detailing and repair as well as a "pack" to cover overhead. The plaintiff also noted the price he expected to receive at auction for the vehicle.

14. The commissions were paid on the difference between the actual sales price obtained by the salesperson and the "cost" set by Mr. Springfield. The salespeople were paid 30% of the net proceeds with 70% going to the dealership. Retail customers made their checks payable to Douglas Motors, not the individual salespeople.

15. The salespeople had no investment in the used vehicles in the Douglas Motors inventory. Mr. Springfield and/or Douglas Motors purchased the vehicles, expended the money for any detailing, repairs or re-conditioning, and determined which vehicles would be sold at a wholesale auction and which vehicles would be sold at retail.

16. Mr. Springfield knew that at least one of the salespersons would be on the business premises during normal business hours to provide service to potential retail customers.

17. While the salespeople negotiated trade-in values with customers, trade-ins were subject to re-appraisal and approval by Mr. Springfield. He had the final decision.

18. The salespeople would handle customer complaints, but if a major problem rose after the sale of a vehicle, it was handled by Mr. Springfield.

19. Mr. Springfield carried a beeper so that the salespeople could call him if they needed to clear something concerning the business activity.

20. Mr. Springfield benefited financially from the presence of the salesmen on the

premises on a daily basis by the virtue of the sales of the inventory to the retail public.

21. As opposed to per transaction, the plaintiff paid the salespeople the total amount of the commissions they had earned at various intervals averaging once every two weeks.

22. Mr. Springfield provided worker's compensation insurance for the salespeople.

23. Mr. Springfield maintained the right to terminate the relationship of any or all of the salespeople at any time as well as the right to take the keys to the warehouse from them.

24. In February of 1988, Mr. Springfield moved Douglas Motors' operations to a location in La Mesa, California. The nature of the business continued to involve both wholesale and retail sales of used vehicles.

25. Mr. Springfield characterized the used car salespeople as independent contractors and, accordingly, did not file employment tax returns or withhold or pay employment taxes.

26. Mr. Springfield entered into written agreements with at least three of the salespeople (Creason, Little and McFall). The agreements themselves were never placed in evidence.

27. Consistent with his treatment of the salespersons as independent contractors, Springfield filed Forms 1099 (Information Returns) and 1096 (Transmittal of Information Returns) with the Internal Revenue Service in Fresno, California, each year from the inception of the business through 1988.

28. The Form 1099's showed plaintiff's Social Security Number, name and business address, as the payor and the Social Security Number, name, address and compensation paid for each salesperson for the period. The form showed in block four that no taxes had been withheld from the compensation paid.

29. Beginning with the taxable quarter ending June 30, 1989, the plaintiff began treating his salespeople as employees.

30. On March 11, 1991, after determining Douglas Motors' salespeople should have been classified as employees, a delegate of the Secretary of the Treasury made assessments of withheld income tax (WH), Federal Insurance Contribution Act (FICA) taxes, Federal Unemployment Tax Act (FUTA) taxes, interest, and various civil penalties against Springfield for the taxable periods and in the amounts as set forth on the certified Transcripts of Assessments and Payments (Forms 4340) which were received in evidence at the trial of this matter.

31. A distinction is drawn in the used automobile sales industry between retail salespersons and wholesale salespersons.

32. Retail salespeople have traditionally been treated as employees.

33. While some distinction may exist between franchise dealers and independent dealers, there does not appear to be a long standing practice of a significant segment of the used automobile sales industry in treating retail salespersons as independent contractors. To the contrary, the weight of the evidence supports the factual finding that retail salespeople are treated as employees.

34. The plaintiff did not conduct a thorough investigation into the relevant law and practice at the time he began hiring said salespersons. Plaintiff did not consult with attorneys, certified public accountants, or representatives of the Internal Revenue Service of Employment Development Department concerning applicable standards and requirements with regard to the characterization of salespeople.

35. Any Finding of Fact which is more appropriately a Conclusion of Law shall be deemed as such.

## CONCLUSIONS OF LAW

1. *The statute of limitations does not bar the collection by the Internal Revenue Service of assessments for the employment taxes, penalties and interest for the years 1983 through 1987, inclusive.*

The plaintiff contends at trial that, notwithstanding the Court's Order of May 10, 1993 denying a motion to dismiss Defendant's claims based upon the Statute of Limitations, he may raise the issue of whether the

assessments of tax made against him were barred by the statute of limitations. The United States contends that such argument is prohibited by the law of the case doctrine.

 Under the law of the case doctrine, a court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case. *Thomas v. Bible,* 983 F.2d 152, 154 (9th Cir.1993). For the doctrine to apply, the issue in question must have been " 'decided either expressly or by necessary implication in [the] previous disposition' [citations omitted]." *Bible,* 983 F.2d at 154.

In his motion to dismiss, the plaintiff argued that the filing of Forms 1096 and 1099 began the running of the statute of limitations on the assessment of the taxes at issue in this case. As a result, according to the plaintiff, the assessments were made too late and the case had to be dismissed. The United States contended that the proper tax returns, Forms 940 and 941, had to be filed to begin the running of the statute of limitations and, because such returns were not filed, the statute never began to run. Following briefing and argument, Judge Rhoades of the District Court, relying on the reasoning set forth in *Ginter v. United States,* 815 F.Supp. 1289 (W.D.Mo.1993), expressly denied the plaintiff's motion to dismiss.

 This Court finds that the issue of the statute of limitations was resolved by Judge Rhoades and that the law of the case doctrine applies. Even if the law of the case doctrine did not dispose of the issue, this Court agrees with Judge Rhoades that *Ginter v. United States,* is controlling. *Ginter* did establish that the filing of the Form 1099 did not trigger the three year statute of limitation of 26 U.S.C. 6501 by its holding that the 1099 informational return was not "the return" contemplated by the statute. The 1099 Forms were simply not the proper returns to have been filed in this context. The issue pressed by the plaintiff in this case is that the filing of the Form 1099 along with the filing of his Form 1040[2] and a Schedule

C would be sufficient to alert I.R.S. officials to the fact of mischaracterization of employees. *Ginter* found that the Form 1099 was not sufficient in and of itself to alert the I.R.S. officials as to a mischaracterization. This Court agrees. This Court also feels that *Commissioner v. Lane–Wells Co.,* 321 U.S. 219, 64 S.Ct. 511, 88 L.Ed. 684 (1944) is dispositive. In that case, a Form 1120 Corporate Income Tax Return and a Form 1120H were required to be filed by the defendant. The company filed only the Form 1120 and responded that it was not a personal holding company. Despite the company's good faith, the corporate tax return was not enough to trigger the statute of limitations. The Court found "the returns did not show the facts in which liability would be predicated," 321 U.S. at 223, 64 S.Ct. at 513. Neither Plaintiff's Form 1040 with its Schedule C, nor the Form 1099s would show the facts in which liability would be predicated in this case. Those documents do not provide any clues that the recipients are in actuality employees. While they demonstrate the existence of claimed independent contract workers, standing alone they do not show a mischaracterization issue nor the basis upon which additional tax liability would be predicated. *See also, Cline v. Commissioner,* T.C.Memo 1988–144.

2. *The assessment of civil penalties under 26 U.S.C. § 6652, § 6676 and § 6722 were not improper in this case nor is there a legal basis for relief established by plaintiff.*

 Plaintiff asserts that the assessment of civil penalties when a taxpayer has filed returns containing the information required and a change in legal theory by the IRS creates the need for a different return form is not appropriate. As a result, plaintiff seeks relief from the civil penalties imposed in this case and made part of the counterclaim. For this premise, plaintiff cites *Maitland A. Wilson v. Commissioner,* 7 T.C. 395, 1946 WL 45 (1946) and *Atlas Oil and Refining Corp. v. Commissioner,* 22 T.C. 552, 1954 WL 650 (1954). Neither *Wilson* nor *Atlas*

---

**2.** There was no indication, nor evidence, that the Form 1099 and Form 1040 with attachments were filed jointly, nor reviewed jointly, by I.R.S.

officials. That notwithstanding, the analysis would be the same.

*Oil* support the proposition asserted. *Wilson* challenges the method of calculation of the 50 percent penalty for fraud and lends no authority or insight on the issue before the Court. *Atlas Oil* deals predominately with the statute of limitations issue and involves a petitioner who had a discrepancy in the calendar versus fiscal year reporting. The Court finds nothing in that case which supports the premise or basis for relief as to the propriety of the civil assessments in this case. The Court also cannot accept the assertion that the requirements of the W–2 form were effectively resolved by the filing of forms 1099 in this case. No authority was cited nor any located to support that proposition. Clearly, the Employment Tax Examination Changes Reports provided to plaintiff in December of 1989, identified the need to file a form W–2 for the subject salespeople and extended time for compliance. This is illustrated in court Exhibit 6. Court Exhibit 6 also alerts plaintiff to the potential that failure to file W–2's as requested at that time, would subject plaintiff to penalties prospectively. Here, plaintiff did not file the forms which would have mitigated the amount of outstanding sums in dispute in this case.

3. *The salesmen were common law employees from 1983 through 1987 for federal employment tax purposes under applicable law.*

The characterization of the salespeople is the heart of this dispute. The plaintiff contends that the salespeople were independent contractors and that there is no tax liability due from his operation of Douglas Motors. The Government asserts that the salespeople were, in fact, employees, covered under Social Security Unemployment Taxes and rendered the employer liable for the withholding and payment of said sums.

■ The burden of establishing a worker's status as an independent contractor rests upon the employer. *Marvel v. United States,* 719 F.2d 1507, 1516 (10th Cir.1983); *Beatty v. Halpin,* 267 F.2d 561, 564 (8th Cir.1959); *In re Pearson,* 86 B.R. 179, 180 (E.D.Mo.1988); *Chase Mfg., Inc. v. United States,* 446 F.Supp. 698, 701 (E.D.Mo.1978).

Sections 3111 and 3301 of the Internal Revenue Code (Title 26, U.S.C.) impose on employers FICA (i.e., Social Security) and FUTA (i.e., unemployment) taxes with respect to wages paid to their employees. Collectively, these two taxes are referred to as employment taxes. In addition, employers must withhold FICA and federal income taxes from employees' wages and remit the amounts withheld to the Internal Revenue Service. 26 U.S.C. §§ 3101 and 3401.

Wages paid to employees are subject to FICA and FUTA taxes which must be paid by the employer. Conversely, payments to independent contractors are subject to the Self Employment Contributions Act (SECA) tax, which must be paid by the independent contractor. S.Rep. No. 1263, 95th Cong., 2d Sess. 209, *reprinted in* 1978 U.S.C.C.A.N. 6761. *See also* 26 U.S.C. § 1401 *et seq.*

26 U.S.C. § 3121 provides several tests employers may use in determining the status of an individual worker for employment tax purposes. 26 U.S.C. § 3121(d)(2) provides that the term "employee" for purposes of Federal Insurance Contributions Act (FICA) tax, means:

"any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee."

26 U.S.C. § 3306(i) provides that the term "employee for purposes of the Federal Unemployment Tax Act (FUTA) tax, has the same meaning as that set forth in 26 U.S.C. § 3121(d)."

"Wages" are defined as "all remuneration ... for services performed by an employee for his employer ..." 26 U.S.C. § 3401(a).

■ The definition of "employer" is found at 26 U.S.C. § 3401(d):

"For purposes of this chapter, the term employer means the person for whom an individual performs or performed any service, of whatever nature, as the employee of such person ..."

The three taxes, known collectively as federal employment taxes, must be collected and paid on remuneration paid to individuals determined to be employees "under the usual

common law rules applicable in determining the employer-employee relationship ..." *Avis Rent A Car System, Inc. v. United States,* 503 F.2d 423, 427 (2d Cir.1974).

■ From relevant judicial decisions, a list of factors have developed which courts consider in determining whether a common law employer-employee relationship exists. Specifically, in *Avis Rent A Car System v. United States,* 503 F.2d at 429, the Second Circuit Court of Appeals reviewed the Supreme Court's decisions in *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), and *Bartels v. Birmingham,* 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), and extracted a list of at least seven criteria which should be examined:

(1) If the person receiving the benefit of a service has the right to control the manner in which the service is performed, the person rendering the service may be an employee.

(2) If a person rendering a service has a substantial investment in his own tools or equipment, he may be an independent contractor.

(3) If a person performing a service undertakes a substantial cost, say by employing and paying his own laborers, he may be an independent contractor.

(4) If a person performing a service has an opportunity to profit depending on his management skill, he may be an independent contractor.

(5) If a service rendered requires a special skill, the person rendering it may be an independent contractor.

(6) If the relationship between a person rendering a service and the person receiving it is permanent, it may be an employment relationship.

(7) If a person rendering a service works in the course of the recipient's business, rather than in some ancillary capacity, he may be an employee.

The criteria set forth above were adopted by the Ninth Circuit in *General Investment Corp. v. United States,* 823 F.2d 337 (9th Cir.1987), and *Real v. Driscoll Strawberry Associates, Inc.,* 603 F.2d 748, 754 (9th Cir. 1979).

No one single factor listed above is dispositive; rather, the determination of whether an employer-employee relationship exists depends "upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730, 67 S.Ct. 1473, 1477, 91 L.Ed. 1772 (1947); *Real,* 603 F.2d at 754–55.

The authoritative elaboration of the common law test is found in Treasury Regulation § 31.3401(c)–1, which states in pertinent part:

(b) Generally the relationship of employer and employee exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so. The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer, but not necessarily present in every case, are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direction of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is not an employee.

(c) Generally, physicians, lawyers, dentists, veterinarians, contractors, subcontractors, public stenographers, auctioneers, and others who follow an independent trade, business, or profession, in which they offer their services to the public, are not employees.

(d) Whether the relationship of employer and employee exists under the usual common law rules will in doubtful cases be

determined upon an examination of the particular facts of each case.

The degree and type of control that an employer must have in order to establish an employment relationship varies with the nature of the work; it "requires only such supervision as the nature of the work requires." *McGuire v. United States*, 349 F.2d 644, 646 (9th Cir.1965); *Westover v. Stockholders Publishing Co.*, 237 F.2d 948, 952 (9th Cir.1956).

An employer/employee relationship exists when the party for whom the services are performed has the right to control and direct the person performing the services. In the current case, the facts enumerated in the Findings of Fact, above, clearly demonstrate that the plaintiff both possessed and exercised the power to control "the manner in which the work [was] performed," *General Investment Corp.*, 823 F.2d at 341, and "was in a position to exercise all necessary supervision over [the salespersons'] simple tasks," *Silk*, 331 U.S. at 718, 67 S.Ct. at 1471, and, consequently, that the salespersons were employees.

The plaintiff had the right to control the manner and means of accomplishing the desired result, that is, the sale of used autos. Specifically, Mr. Springfield made all cost, wholesale pricing and inventory decisions. Mr. Springfield also provided all the advertising used by Douglas Motors and the salespeople to attract customers to the warehouse for the retail sales. This included not only payment for the advertising but selection of the vehicles and advertisement information. Mr. Springfield was also the final authority on all trade-in valuations and customer complaints. Further, all of the retail sales transactions were carried out using Douglas Motors' state-issued paperwork with the business earning 70% of the profit from each of the retail sales transactions. The salespersons had no investment in the vehicles that were sold nor any significant investment in any "tools of the trade." Obviously, automobile sales were in the course of Douglas Motors' business. And, while the salespeople were remunerated based on each sale that was made, they did not "profit" because they had no investment in the vehicles sold. Finally, most of the sales personnel had long-term relationships with Douglas Motors. Insofar as the salespeople were subject to the will and control of the plaintiff as to how and what should be done, an employer/employee relationship existed between them.

The plaintiff directed and controlled the salespersons in their selling activities. More importantly, in those instances when he was not on the premises, Springfield had the *right* to direct and control the salespersons. In fact, the salespeople looked to Mr. Springfield for direction as needed in the areas of costs, trade-in valuations and customer complaints and could reach him as necessary through his beeper. Thus, Douglas Motors' retail sales personnel were common law employees.

Neither the physical dimensions of the car lot nor the size of the car inventory is a determining factor in whether the salesmen were employees. The Court looks to the nature of the association between Springfield and the salespersons in determining the automobile salespersons were employees rather than independent contractors.

It would be disingenuous to argue that Mr. Springfield derived no benefit from this "relationship" despite the plaintiff's testimony at trial. Having the salespeople on site to sell the inventory to retail customers was a substantial benefit to the dealership. It is also not feasible to accept that Mr. Springfield had not come to expect the presence of the salespeople at the site on a daily and regular basis. That would provide the only mechanism and opportunity for sales which would lead to the source of compensation for the salespeople. With the exception of the wholesale activities of Mr. Killian, and those portions of Mr. McFall's activities related to wholesale (which were never quantified at trial on any basis) all of the other activities by the salespeople based on the credible evidence fit the factors identified by the Court in considering whether a common law employer-employee relationship exists. Based upon the circumstances of the whole activity, the Court concludes by a preponderance of the evidence that the salespeople were employees.

The testimony of Peter Smith and Lloyd Little are significant in this regard and are substantially corroborated by other witnesses, including portions of the plaintiff's testimony in supporting the findings and conclusions in this case.

4. *Whether plaintiff is entitled to relief from liability for the tax assessment under the Safe Harbor Provisions of Section 530 of the Revenue Act of 1978, etc.*

Section 530 of the Revenue Act of 1978 ("Section 530"), Pub.L. 95–600, Section 530, 92 Stat. 2763 (1978), *reprinted in* 1978 U.S.C.C.A.N. 6761, provides that a worker shall not be deemed to be an employee unless the taxpayer had no reasonable basis for not treating the worker as an employee.

In defining reasonable basis, the statute provides that there are three "safe harbors" which form the basis for an objective "reasonable basis" standard. These safe harbors are: (1) reliance on judicial precedent, published rulings, or technical advice or a letter ruling to the taxpayer; (2) reliance on a past favorable IRS audit on the same issue; or, (3) treating the particular workers as independent contractors was the longstanding, recognized practice of a significant segment of the industry in which the individual was engaged. Section 530(a)(2)(A), (B), and (C).

In addition to requiring a reasonable basis for failing to treat a worker as an employee, Section 530 mandates that a taxpayer have filed all applicable federal tax returns (including information returns) consistent with the workers not being employees, *e.g.,* Forms 1099 rather than Forms W–2.

 The taxpayer has the burden of showing he satisfies the requirements for Section 530 relief. *In re McAtee,* 115 B.R. 180, 182 (Bankr.N.D.Iowa 1990); *In re Rasbury,* 130 B.R. 990, 1003 (Bankr.N.D.Ala. 1991). Although the parties have stipulated that the plaintiff filed all applicable tax returns relevant to treating his used car salespersons as independent contractors, he did not satisfy the other requirements for Section 530 relief.

The plaintiff contends he is entitled to Section 530 relief due to the applicability of the "industry practice" safe haven. In addition, Plaintiff argues that he had a "reasonable belief" that the salespersons were independent contractors.

In *General Investment Corp. v. United States,* 823 F.2d 337 (9th Cir.1987), the Ninth Circuit Court of Appeals reviewed the term "significant segment of the industry" and found that similar sized operations located in the same geographic region as the taxpayer constituted the proper segment of the industry for review. Accordingly, the applicable industry segment in the present case is the San Diego metropolitan area, the geographic area in which the plaintiff operated his retail car sales business. The Court has reviewed the practice of similar companies within that area based on the evidence submitted by the parties.

The evidence at trial demonstrated that Springfield is not entitled to Section 530 relief. Plaintiff failed to prove it was the long-standing, recognized practice of a significant segment of the used automobile sales industry in the metropolitan San Diego area to treat retail salesmen as independent contractors during the periods in issue. On the contrary, the evidence demonstrated that retail salespersons have, for the most part, traditionally been treated as employees in the San Diego metropolitan area. There is, however, some contradictory practice in that community.

Although the plaintiff presented evidence that some used car businesses treated salesmen as independent contractors, that evidence does not allow the plaintiff to qualify for the "industry practice" safe haven since Section 530 only protects individuals who follow the "long-standing practice of a significant segment of an industry."

Where various segments of an industry are using contradictory practices, logic and the law dictates that there is no "long-standing recognized practice." Thus, in this case the fact that different members of the industry were treating salesmen differently mandates a finding that the "industry practice" safe haven relief of Section 530 is unavailable.

Further, the plaintiff failed to demonstrate he had a "reasonable basis" for treating the salespersons as independent contractors for federal employment tax purposes. Plaintiff contended that he had a reasonable basis for characterizing his salesmen as independent contractors because there was confusion regarding the characterization of such workers. However, misunderstanding or confusion about the law is not a defense for failing to properly characterize employees or pay employment taxes. It is also insufficient to qualify him for Section 530 relief given Mr. Springfield's testimony that he never consulted with attorneys, certified public accountants, representatives of the Internal Revenue Service, or of the Employment Development Department concerning the applicable standards and requirements with regard to the characterization of salespeople also makes his reasonableness argument difficult to accept. He relied simply on things he had heard from others in the business rather than making his own inquiry.

5. *Plaintiff's rights were not violated by the asking for and reviewing of his business records and personal tax returns in this case.*

The plaintiff contends that the failure of the IRS to follow certain unspecified procedures in the Internal Revenue Manual violated his rights. The Internal Revenue Manual, which was "adopted solely for the internal administration of the IRS, rather than for the protection of the taxpayer, does not confer any rights upon the taxpayer." *United States v. Will,* 671 F.2d 963, 967 (6th Cir.1982); *see also, Urban v. C.I.R.,* 964 F.2d 888, 890 (9th Cir.1992) ("[T]he CIR's compliance with the IRM's requirements is not mandatory"); *United States v. Horne,* 714 F.2d 206, 207 (1st Cir.1983) (provisions of Internal Revenue Manual are not mandatory and lack the force of law).

While it is unclear from the plaintiff's argument at trial exactly which of his rights he believes have been violated and which of the provision of the Internal Revenue Manual he believes the IRS failed to follow, it is clear that the IRM does not create substantive rights in favor of the plaintiff. No evidence was produced at trial with regard to existing regulations that were, in fact, violated as proof of any claim by plaintiff. As a result, the Court finds as a conclusion of law that plaintiff has failed to make his burden of proof with regard to any existing rights under the Internal Revenue Manual, or the violation thereof in this case.

6. *The Doctrine of Equitable Estoppel is not applicable under the evidence in this case.*

Plaintiff listed equitable estoppel as an issue in the Joint Pre–Trial Order and argued for equitable relief at trial. Plaintiff cites *Licari v. Commissioner,* 946 F.2d 898 (9th Cir.1991), *Schneider v. Kelm,* 137 F.Supp. 871 (D.Minn.1956), and *Stearns v. U.S.,* 291 U.S. 54, 54 S.Ct. 325, 78 L.Ed. 647 (1934). The United States contends that, under the facts of this case, equitable estoppel cannot lie against the Government. *See O.P.M. v. Richmond,* 496 U.S. 414, 427–28, 110 S.Ct. 2465, 2473, 110 L.Ed.2d 387 (1990); *United States v. Fowler,* 913 F.2d 1382, 1385–86 (9th Cir.1990).

It has long been recognized that equitable estoppel will not lie against the Government as it lies against private litigants, *O.P.M. v. Richmond,* supra. In *Lee v. Munroe & Thornton,* 11 U.S. (7 Cranch) 366, 3 L.Ed. 373 (1813), the Supreme Court held that the Government could not be bound by the mistaken representations of an agent unless it were clear that the representations were within the scope of the agent's authority. In *In re Floyd Acceptances,* 74 U.S. (7 Wall.) 666, 19 L.Ed. 169 (1868), the Supreme Court held that the Government could not be compelled to honor bills of exchange issued by the Secretary of War where there was no statutory authority for the issuance of the bills. In *Utah Power & Light Co. v. United States,* 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917), the Supreme Court dismissed the argument that unauthorized representations by agents of the Government estopped the United States to prevent erection of power houses and transmission lines across a public forest in violation of a statute. The Court specifically stated, "Of this it is enough to say

that the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit." *Id.* at 408–09, 37 S.Ct. at 391.

No evidence was presented at trial to suggest any affirmative conduct or action by the Internal Revenue Service or its agents upon which plaintiff relied to his detriment or relied on in any event. To the contrary, plaintiff testified that he had not checked with the Internal Revenue Service, among others, with regard to the characterization of salespeople as employees versus independent contractors. Even if we assume that equitable estoppel can exist in a claim by the government (which the Court is not suggesting by this decision) there is simply no evidence upon which to grant this type of relief if authority existed.

7. *California Vehicle Code § 285, 286, 675, 11700–11727 and 11800–11809, are inapplicable and irrelevant regarding the characterization of salespersons as employees or independent contractors and/or to the analysis of relief under § 530.*

The defendant asserts that under the California Vehicle Code statutory scheme that plaintiff was required to characterize the salespersons as employees by the California Vehicle Code. Defendant concludes that the California Vehicle Code effectively classifies salespersons as statutory employees. In addition, the Government contends that it is manifestly unreasonable for the plaintiff to treat the salespersons as independent contractors under the California Vehicle Code provisions. This is based upon the following analysis by the defendant.

The plaintiff was licensed by the California Department of Motor Vehicles as an automobile "dealer." Cal.Veh.Code §§ 285 & 286. The sales personnel were licensed as "vehicle salespersons." Cal.Veh.Code § 675. To obtain and maintain a dealer's license, California's vehicle dealers are required to comply with a number of provisions of the California Vehicle Code. *See* Cal.Veh.Code §§ 11700, *et seq.* Likewise, to obtain a salesperson's

license, sales personnel are required to follow certain provisions of the Code. *See* Cal.Veh. Code §§ 11800, *et seq.*

Additionally, throughout the relevant code sections, the California Legislature refers to salespersons being "employed" by a dealer. *See, e.g.,* Cal.Veh.Code §§ 286(c), 675(a)(1), and 11709(a); *see also, People v. Hotz,* 85 Cal.App. 450, 453, 259 P. 506 (1927). Further, the salespersons may be employed by only one dealer. *See* Cal.Veh.Code § 11806(f); Cal.Atty.Gen.Op. No. 58–156, *reprinted in* 32 Atty.Gen.Op. 208; and, section 11713(h) requires a dealer to report a salesperson's employment or termination of employment to the State.

Finally, included among the conditions placed upon dealers is the requirement that the dealer post a bond with the state. Cal. Veh.Code § 11710. Individual salespersons are not required to post such a bond since the dealer by whom they are employed may be liable for the bad acts of the salespersons. Cal.Veh.Code § 11711. Retail purchasers may recover judgments against the dealer or his salespersons from the posted bond. Cal. Veh.Code § 11710.

Defendant's analysis concludes that all of the sales transactions conducted by Douglas Motors were under that business' dealer or "distinguishing" number, Cal.Veh.Code § 11701, and on the business' state-issued paperwork. Cal.Veh.Code § 11714(c). Unless the salespersons were licensed by the state and employed by Douglas Motors, it was a direct violation of California law to allow them to use Douglas Motors' state-issued sales forms to complete the sales transactions. Cal.Veh.Code § 11713(h) and (m). Based thereon, the salespersons were statutory "employees" and subject to employment taxes on this basis rather than independent contractors and that plaintiff was manifestly unreasonable in treating the salespeople, therefore, precluding section 530 relief.

The Court determined prior to trial that the California Vehicle Code statutes did not require characterization of the salespersons as employees as opposed to independent contractors and as a result, that these sections were not applicable nor relevant to the analy-

sis of "characterization" for tax purposes or reasonableness relative to relief under section 530. The Court has agreed to reconsider the issue on motion by the Government. Upon reconsideration, the Court continues to find these provisions not applicable nor relevant.

As defined by Cal.Veh.Code § 675(a)(1), a salesperson is someone who:

> (1) Is employed as a *salesperson* by a dealer, as defined in section 285, or who, under any form of contract, agreement, or arrangement with a dealer, for commission, money, profit, or other thing of value, sells, exchanges, buys, or offers for sale, negotiates, or attempts to negotiate, a sale, or exchange of an interest in a vehicle required to be registered under this code.

■ The definition of "salesperson" by the Code embraces not only the typical employee, but also independent contractors. To be employed by someone is not synonymous with being someone's employee. A dealer contracting with an independent contractor under the common law definitions would not be in violation of the Vehicle Code by that fact alone. As a result, this evidence does not meet the definition of relevance under Federal Rule 401 in that it does not have any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable then it would be without the evidence.

Based on the above Findings of Fact and Conclusions of Law, the Court finds in favor of the United States of America and against Martin Springfield dba Douglas Motors.

It is so Ordered Adjudged and Decreed that:

Judgment is hereby entered in favor of defendant/counterclaim plaintiff United States of America and against plaintiff/counterclaim defendant Martin Springfield dba Douglas Motors, in the amount of $70,555.13, plus interest pursuant to 26 U.S.C. §§ 6601, 6621, 6622 and 28 U.S.C. § 1961(c)(1) and applicable statutory additions from August 1, 1994.